## KNOELL et al. v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit. February 2, 1917. Rehearing Denied March 14, 1917.)

### No. 2121.

1. CONSPIRACY ⬤⇒43(6)—INDICTMENT—RECEIVING PROPERTY FROM BANKRUPT.
    An indictment, charging that defendants, on the day after a petition in bankruptcy was filed, conspired together and with others to receive a material amount of the property of the bankrupt with intent to defeat the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 544), and that on the following day they agreed to receive that property from the bankrupt and conceal it with intent to convert it to their own use, and charging as the overt acts that on the second day after the bankruptcy they placed the property on the premises of one of the alleged conspirators and persuaded him to allow it to be concealed temporarily, and later induced him to swear to a petition claiming it as his own, which he did, is sufficient to charge a conspiracy to receive the property of the bankrupt after the bankruptcy, contrary to section 29b, cl. 4 (Comp. St. 1913, § 9613); it not being necessary that the property was in the possession of the bankrupt when the conspiracy was formed if it was in fact the property of the bankrupt.
    [Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 91; Dec. Dig. ⬤⇒43(6).]

2. INDICTMENT AND INFORMATION ⬤⇒146—DEMURRER—EFFECT AS ADMISSION.
    On demurrer to the indictment, the averments contained therein are to be taken as true.
    [Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 489; Dec. Dig. ⬤⇒146.]

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. CONSPIRACY ⬌28—EVIDENCE—RECEIVING PROPERTY FROM BANKRUPT.**

Defendants may be convicted of conspiracy to receive the property from a bankrupt after bankruptcy, with intent to defeat the Bankruptcy Act, though the evidence shows that the property was taken out of the bankrupt's possession two days before the petition in bankruptcy was filed, since the final agreement may not have been made until thereafter, and the property continued to be the property of the bankrupt.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 40, 41; Dec. Dig. ⬌28.]

**4. CONSPIRACY ⬌28—TIME OF COMMISSION—CONTINUING CONSPIRACY.**

Those conspiring before a petition in bankruptcy was filed to receive the property of the bankrupt with intent to defeat the Bankruptcy Act, under an agreement which contemplated further action after the petition was filed, may be convicted of a conspiracy to receive the property after bankruptcy.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 40, 41; Dec. Dig. ⬌28.]

**5. INDICTMENT AND INFORMATION ⬌125(5½)—DUPLICITY—SEVERAL OFFENSES —CONSPIRACY.**

An indictment, charging a conspiracy to commit four separate offenses of concealing property by a bankrupt, making false oath, presenting a false claim, and fraudulently receiving property, is not bad for duplicity, since the conspiracy is but a single offense, though it contemplated the commission of several offenses.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 237; Dec. Dig. ⬌125(5½).]

**6. CRIMINAL LAW ⬌510—EVIDENCE—TESTIMONY OF ACCOMPLICE—NECESSITY OF CORROBORATION.**

Though the jury should use the utmost caution in scrutinizing the uncorroborated testimony of an accomplice, they may, if they believe that testimony after such scrutiny, convict accused on it alone.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1124–1126; Dec. Dig. ⬌510.]

**7. CRIMINAL LAW ⬌393(1)—EVIDENCE—DECLARATIONS OF ACCUSED—PREVIOUS TESTIMONY—SUBPŒNA.**

Testimony given before the referee in bankruptcy by those subsequently accused of conspiring to receive property of the bankrupt is voluntary and admissible in the subsequent prosecution, though they were subpœnaed to testify before the referee, if when called to testify they made no claim of privilege to avoid incrimination.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 871; Dec. Dig. ⬌393(1).]

**8. CRIMINAL LAW ⬌393(1)—TESTIMONY IN BANKRUPTCY PROCEEDINGS—IMMUNITY—PERSONS ENTITLED.**

Bankruptcy Act, § 7a, cl. 9 (Comp. St. 1913, § 9591), providing that no testimony given by the bankrupt shall be offered in evidence against him in any criminal proceedings, applies to the bankrupt only, and affords no protection to other witnesses, testifying in the bankruptcy proceedings, who are subsequently charged with conspiring to receive property of the bankrupt.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 871; Dec. Dig. ⬌393(1).]

**9. CRIMINAL LAW ⬌918(10, 11)—INCOMPETENT EVIDENCE—OBJECTIONS—NECESSITY.**

Where the husband of the bankrupt testified, in a prosecution for conspiring to receive property from the bankrupt, to facts tending to incriminate his wife, but no objection was made to such testimony, and no mo-

tion to strike it after the trial court called the attention of counsel to its incompetency, the objection cannot be raised on the motion for new trial.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. ☞918(10, 11).]

10. WITNESSES ☞52(7)—RULES OF DECISION—STATE LAWS—COMPETENCY OF WITNESSES.

The competency of a witness to testify against codefendants of her husband after he had pleaded guilty depends, in the absence of state or federal statute, on the common law of the state at the time of the first judiciary act.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 132–134; Dec. Dig. ☞52(7).]

11. WITNESSES ☞52(7) — COMPETENCY — WIFE OF CODEFENDANT — PLEA OF GUILTY.

The wife of one of several defendants charged with conspiracy, who has pleaded guilty, can testify against the other defendants, over their objection, where neither she nor her husband claims any privilege, though if he had not pleaded guilty, her testimony would be incompetent, since the reason for that rule, which is to prevent the violation of confidences between husband and wife and the incrimination of one by the other, no longer applies after the plea of guilty.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 132–134; Dec. Dig. ☞52(7).]

12. CRIMINAL LAW ☞1159(3)—APPEAL—REVIEW—CONFLICTING EVIDENCE.

Where the evidence concerning the crime charged was in decided conflict, but a material part supported the indictment, the verdict is final on the facts.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3076; Dec. Dig. ☞1159(3).]

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

John Knoell and another were convicted of conspiracy to violate the Bankruptcy Act, their motion for new trial was overruled (230 Fed. 509), and they bring error. Affirmed.

Wm. A. Gray and Reuben O. Moon, both of Philadelphia, Pa., for plaintiffs in error.

Francis Fisher Kane, U. S. Atty., and Robert J. Sterrett, Asst. U. S. Atty., both of Philadelphia, Pa.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. John Knoell, George Knoell, and Reuben Turetz were indicted for conspiring to violate several provisions of the Bankruptcy Act. The indictment comprised five counts, but the first three were set aside on demurrer. Turetz pleaded guilty to the fourth and fifth, the others were convicted, and all of them were sentenced to imprisonment. To this judgment the Knoells alone have sued out the pending writ of error, raising several questions that call for consideration.

[1] 1. The sufficiency of the fourth count. The Knoells were wholesale dealers in furniture, and Rose Turetz was a retail dealer, her husband, Reuben, managing the business. An involuntary petition was

filed against Rose on November 23, 1914, and the count charges that, on or about November 24 the three defendants conspired with Rose and with Jacob Winderman, Hyman Rash, Harry Dubin, and Joseph Sandler knowingly and fraudulently to receive from Rose, after the filing of the petition, a material amount of property—brass and iron beds worth about $500—with intent to defeat the act. The count charged, further, that on the 25th the three defendants, knowing that the beds belonged to Rose's estate, agreed to receive them from her, and after such receiving concealed them on the premises of Jacob Winderman,. with intent to convert them to their own use. Thus far, the averments of the count are formally correct, and they are not impaired by the description of the overt acts. These are averred to be four in number: (a) About November 25 the defendants placed the beds on Winderman's premises; (b) about the same date they induced Rash to persuade Winderman to allow the beds to be concealed temporarily. (c) on December 4 Turetz induced Winderman to swear to a petition, alleging the beds to be his, and asking the bankruptcy court (whose receiver had meanwhile taken them into possession) to order their return to him; (d) on the same day Winderman signed the petition, and this was afterwards presented to the court.

[2] On demurrer all the averments in the count are to be taken as true, and it is not easy to see wherein they are defective. The beds may have been removed from the possession of Rose before November 23 or afterward, but in either event they continued to be her own property, or the property of her estate. It was not necessary that they should remain in her actual possession; they belonged to her or to the estate; and the conspiracy is charged to have been formed on November 24, the overt acts just set forth helping to show that in form the count is within section 29b4. The demurrer was properly overruled.

[3, 4] 2. The conviction on the fourth count. The assignment of error is supported by an exception, and the contention is that the evidence did not sustain the count, and that such an instruction should have been given. The point of the argument is this: The evidence showed that the beds had been removed on November 21 from Rose's store on Passayunk avenue to the store of Hyman Rash. From there —but just when does not appear—they were removed to Winderman's place of business next door. The beds were taken to Rash's two days before the petition was filed, and the plaintiffs in error contend that the date of the offense is thus fixed as the 21st, and therefore that the beds could not have been received after the filing of the petition. The facts may be true, but the conclusion does not necessarily follow. The argument apparently does not consider that the offense charged is not the actual receiving, but the conspiring to receive. We do not see why the conspirators might not have finally agreed after the beds were removed from the Passayunk store on the 21st. No doubt the goods were in fact removed before the 23d, but the guilty agreement may not have been definitely made until afterward. Certainly, the conspirators would find it easier to receive and convert the goods if these were first put out of the court's reach, whose receiver would immediately seize whatever might be found on the bankrupt's premises. Aside

from this, however, the goods continued to belong to Rose or to her estate after November 21, and the mere taking them to Rash's on that date did not finally determine what was to be done with them. On the 21st Rose was not a bankrupt; she might never be a bankrupt—in fact, she was not adjudicated until January 25—and the goods might be returned to her. But in any event their status was still uncertain, and we think the jury might, with equal propriety, assign the final act of conspiring either to the 21st or to a date after the 23d. Moreover, even if the conspiracy was first formed not later than the 21st, we think there is something to be said for the view that it was a continuing conspiracy, contemplating further action during the next few days or weeks; and, if this be true, the distinction now contended for cannot be successfully drawn. U. S. v. Kissel, 218 U. S. 601, 31 Sup. Ct. 124, 54 L. Ed. 1168. We repeat that the count is not for receiving, but for conspiring to receive, and of this after the date of bankruptcy we think there was evidence for the jury.

[5] 3. The sufficiency of the fifth count. This is attacked for duplicity on the ground that four separate offenses are charged therein. It is true that the count does charge the three defendants, in agreement with the other five persons named above, with conspiring to commit the following offenses: (a) Concealment of property by Rose Turetz; (b) making a false oath by Jacob Winderman; (c) presenting a false claim by Jacob Winderman; (d) fraudulently receiving property by the three defendants after the filing of the petition;˙but, in view of the decisions in Crain v. United States, 162 U. S. 625, 16 Sup. Ct. 952, 40 L. Ed. 1097, and in Brewing Co. v. U. S. (C. C. A. 8) 206 Fed. 386, 124 C. C. A. 268, we think it unnecessary to discuss the objection. Although a conspiracy may contemplate the commission of four offenses, it still remains a single crime. In our opinion the count is correctly drawn, and was properly upheld.

4. The refusal to direct a general verdict of acquittal. We are not sure whether this objection is seriously pressed, but (if it be) we content ourselves with saying that in view of the evidence such a direction could not properly have been given.

[6] 5. The court's instructions concerning the testimony of an accomplice. The brief of the plaintiffs in error admits that the charge to the jury—

"  *  *  *  may be, perhaps, fairly summarized in the statement that the trial judge did charge the jury to the utmost extent about the necessity of using caution in scrutinizing the testimony of these witnesses."

But complains that:

"  *  *  *  While the trial judge did warn them of the corrupt nature of this testimony and its inherent unreliability, and also further instructed the jury as to the advisability of looking into the testimony of other witnesses to find if this impeached testimony was corroborated thereby, [he] did instruct the jury that, notwithstanding all this warning, if in their judgment they believed, notwithstanding the corrupt source from which the testimony came, that it was nevertheless true, they could render a verdict of guilty upon that testimony uncorroborated."

We think the instructions thus summarized are justified by Richardson v. U. S. (C. C. A. 3) 181 Fed. 9, 104 C. C. A. 69; Diggs v. U. S. (C. C. A. 9) 220 Fed. 545, 136 C. C. A. 147, affirmed 242 U. S. 470, 37 Sup. Ct. 192, 61 L. Ed. ——; Holmgren v. U. S., 217 U. S. 523, 30 Sup. Ct. 588, 54 L. Ed. 861, 19 Ann. Cas. 778. In the latter case the precise point did not arise. The Supreme Court was asked to hold that the trial judge had erred in refusing the following instruction:

"I charge you that if you believe the testimony of the witness Frank Werta, then that said witness was an accomplice in crime with the defendant; and I instruct you that before you can convict said defendant, the testimony of the witness Frank Werta should be corroborated by the testimony of at least one witness, or strong corroborative circumstances."

But the refusal below was upheld, Mr. Justice Day saying:

"It may be doubtful whether Werta can be regarded as an accomplice. * * * Be that as it may, the request did not properly state the law, as it assumed that Werta was an accomplice, a conclusion which was controverted, and against which the jury might have found in the testimony"

—and adding:

"It is undoubtedly the better practice for courts to caution juries against too much reliance upon the testimony of accomplices, and to require corroborating testimony before giving credence to them. But no such charge was asked to be presented to the jury by any proper request in the case, and the refusal to grant the one asked for was not error."

This seems to us to mean necessarily that a jury may rely upon the testimony of an accomplice, but that the judge should caution them against believing it unless it has been corroborated. The decided weight of authority is in favor of the rule as laid down in the instructions now assigned for error. See, also, 1 Ruling Case Law, p. 166, § 13 et seq.

[7, 8] 6. The admission of testimony given by John Knoell and George Knoell before the referee in the proceeding against Rose Turetz. The objection is that this testimony was given under compulsion, and therefore could not be used in the criminal trial. But the objection is not founded on fact. No doubt the Knoells appeared before the referee in obedience to a subpœna, but there was no other compulsion. They were attended by counsel, and were examined without claiming the right to be silent because their answers might criminate them. Burrell v. Montana, 194 U. S. 572, 24 Sup. Ct. 787, 48 L. Ed. 1122. Clearly the subpœna did not compel them to testify; it only compelled them to attend; and whatever testimony they gave afterwards without claiming their privilege was voluntary, and could be used against them in a subsequent proceeding. Section 7a9 of the act applies to the bankrupt only, and does not protect the ordinary witness, whose rights must rest upon the general rules of law. Under these we see no room for doubt that the testimony now objected to was voluntary and was properly admitted. Hardy v. United States, 186 U. S. 224, 22 Sup. Ct. 889, 46 L. Ed. 1137; Vermont v. Duncan, 4 L. R. A. (N. S.) 1144, note; 12 Cyc. 424, and cases in notes.

[9] 7. The admission of the testimony of Reuben Turetz. It is now urged that he should not have been heard, because, although his wife was not on trial and, indeed, was not indicted, his testimony tended to prove that she had been guilty of crime. No objection was made at the trial, and the following quotation from Judge Dickinson's opinion, refusing a new trial ([D. C.] 230 Fed. 513), will show that the failure to object was not an oversight:

"It may be explained in passing that, not only was no objection interposed to his testimony, but he was the first, or an early, witness called. The full facts of the case had not then been disclosed. He was heard by the court under the impression that he was himself the bankrupt. Later it developed, or at least came to the attention of the trial judge, that the wife was the bankrupt. At once the thought of his incompetency arose and was presented to counsel. The notes of testimony do not show just what took place, but it was made clear that the absence of objection was not an inadvertence, and no motion to strike out was made. As the defendants were represented by counsel of experience and ability, fully equal to the discharge of the duty of safeguarding the interests of their clients, the trial judge did not see his way clear to further interfere."

Under the circumstances we need only refer to Burrell v. Montana, 194 U. S. 577, 24 Sup. Ct. 787, 48 L. Ed. 1122, in support of the proposition that the objection was made too late.

8. The chief stress of the argument on this writ has been laid upon the remaining subject, namely, the qualified admission of Rose Turetz as a witness. As stated above, Reuben had pleaded guilty and was no longer on trial. His wife was sworn, and answered a few preliminary questions, after which she was asked whether she had had any conversation with George Knoell before her failure. Thereupon counsel for the defendants on trial made a general objection to her competency, and the trial judge held that:

"She may testify as to anything affecting either of the defendants on trial. If she is asked other questions, we had better have a specific objection. As far as that question is concerned, the objection is overruled"

—defending the decision afterward on the motion for a new trial (D. C.) 230 Fed. 509.

On the face of it, this is a narrow ruling, but we shall follow the parties and accept it as a broad decision that she was competent generally against the defendants on trial. As the few pages of her testimony show, she was only allowed to speak of matters that affected the Knoells, and she did not testify directly against her husband at all. The question, therefore, is this: Reuben having pleaded guilty and having no further interest in the trial, and no objection having been made either by him or by herself, was it proper to allow her to testify about matters that directly affected the Knoells only? In our opinion the ruling is sustained, both by reason and by the weight of authority.

[10,11] There is no federal statute on the subject, and her competency stands or falls by the law of Pennsylvania at the date of the first Judiciary Act (U. S. v. Reid, 53 U. S. [12 How.] 361, 13 L. Ed. 1023); that is—the state having then no relevant statute—by the rules of the common law. Logan v. U. S., 144 U. S. 301, 12 Sup. Ct. 617, 36 L. Ed. 429; Maxey v. U. S. (C. C. A. 8) 207 Fed. 329, 125 C. C. A. 77.

The general question has received attention in many cases, and the discussion has been sometimes confused in part we think by the failure to keep sufficiently in mind the difference between: (1) The situation presented when one spouse is called in favor of the other; and (2) the situation when one is called against the other. In (1) the witness is incompetent for several reasons, chief among them being the presumed identity of interest; in (2) the spouse against whom the testimony is offered has the right or privilege to prevent the other from speaking. These situations are distinct, and, as far as possible, should be kept distinct. Confining our attention to the trial of a crime, and to the offer of one spouse's testimony against the other, where the latter, although a formal party to the record, has been convicted or has pleaded guilty, let us consider the matter closely. The wife, let us say, is called against those indicted with her husband, although he is not on trial, but has been convicted separately or has pleaded guilty. Now, if (in spite of his conviction or his plea) the husband is still at liberty to assert the privilege of objecting, we shall assume for the moment that she cannot be allowed to testify. If, however, he does not object, or if he affirmatively consent, he thereby waives the privilege as far as he can, and another question then arises, namely: In such a situation may she herself assert a privilege of refusing to testify? If the privilege is still hers as well as his, we shall assume again that she may exercise it, and in that event her consent to testify is a waiver, as far as her power goes. Up to this point, the facts in the trial under review show that neither Reuben nor Rose made any claim to privilege, and therefore, as far as they themselves could affect the matter, her testimony was admissible. Could the other defendants object? They had no personal privilege to assert, and unless the marital privilege rests on a ground that permits any defendant on trial to assert it, or requires the trial judge to enforce it of his own motion, the ruling under examination was correct.

The only ground that can support such a position is public policy, and on that, and that alone, the plaintiffs in error rely. The principal cases cited in the brief are Stein v. Bowman, 38 U. S. (13 Pet.) 221, 10 L. Ed. 129, Bassett v. U. S., 137 U. S. 503, 11 Sup. Ct. 165, 34 L. Ed. 762, Pringle v. Pringle, 59 Pa. 288, and Cornelius v. Hambay, 150 Pa. 363, 24 Atl. 515; and in these some language may be found that will bear the broad construction placed upon it, but in none of them, and in no other case to which our attention has been called, has a court directly decided that a spouse cannot testify under the facts now presented. Pringle v. Pringle does not apply; this was a civil suit in which two daughters of a decedent were incompetent witnesses against their father's estate because of their interest, and the point decided is that their respective husbands also were incompetent—not against the daughters, but in their favor. Neither does Bassett v. U. S. apply. In that case, a husband in the (then) territory of Utah was on trial for a polygamous marriage, and his legal wife was allowed to testify, over his objection, that he had confessed the marriage to her. She was testifying directly against him, and the Supreme Court held that Congress had not made her testimony admissible by the Utah Code of Pro-

cedure. Congress had expressly declared that a wife could not be a witness against her husband without his consent, except in a proceeding for a crime committed against her; and it was held that a trial for polygamy was not such a proceeding.

The other two cases are like the present in some particulars, but not in all. In Cornelius v. Hambay a husband was suing his wife's paramour for damages. The husband was allowed to testify to the criminal intercourse over the defendant's objection, and the ruling was declared erroneous on the ground that the husband was testifying to the wife's adultery, and was thus directly charging her with the crime. The paramour was allowed to assert her privilege, but the decision has nothing to say about what would have been the proper ruling, if she had already been tried and had pleaded guilty. Stein v. Bowman was a civil action in which the deposition of a deceased witness had been taken, and his widow was then allowed to testify, over the defendant's objection, that her husband had been bribed to give the deposition, and also that he had made declarations in contradiction thereof. The defendant was allowed to assert the husband's privilege, although the question arose in a collateral proceeding; but, again, nothing is said about the effect of a conviction or a plea of guilty, and, moreover, the discussion is apparently somewhat influenced by the rules governing confidential communications. But, on whatever ground, the admission of her testimony was disapproved; and, as the plaintiffs in error rely with the utmost confidence on Mr. Justice McLean's opinion, we quote the following paragraphs at length:

"The law does not seem to be entirely settled, how far, in a collateral case, a wife may be examined on matters in which her husband may be eventually interested. Nor whether, in such a case, she may not be asked questions as to facts that may, in some measure, tend to criminate her husband, but which afford no foundation for a prosecution. The decisions which have been made on these points seem to have been influenced by the circumstances of each case, and they are somewhat contradictory. It is, however, admitted in all the cases that the wife is not competent, except in cases of violence upon her person, directly to criminate her husband, or to disclose that which she has learned from him in their confidential intercourse. Some color is found in some of the elementary works for the suggestion that this rule, being founded on the confidential relations of the parties, will protect either from the necessity of a disclosure, but will not prohibit either from voluntarily making any disclosure of matters received in confidence; and the wife and the husband have been viewed, in this respect, as having a right to protection from a disclosure, on the same principle as an attorney is protected from a disclosure of the facts communicated to him by his client.

"The rule which protects an attorney in such a case is founded on public policy, and may be essential in the administration of justice; but this privilege is the privilege of the client, and not of the attorney. The rule which protects the domestic relations from exposure rests upon considerations connected with the peace of families. And it is conceived that this principle does not merely afford protection to the husband and wife, which they are at liberty to invoke or not, at their discretion, when the question is propounded; but it renders them incompetent to disclose facts in evidence in violation of the rule. And it is well that the principle does not rest on the discretion of the parties. If it did, in most instances, it would afford no substantial protection to persons uninstructed in their rights, and thrown off their guard and embarrassed by searching interrogatories.

"In the present case, the witness was called to discredit her husband; to prove, in fact, that he had committed perjury; and the establishment of the

fact depended on his own confessions. Confessions which, if ever made, were made under all the confidence that subsists between husband and wife. It is true, the husband was dead, but this does not weaken the principle. Indeed, it would seem rather to increase than lessen the force of the rule. Can the wife, under such circumstances, either voluntarily be permitted, or by force of authority be compelled, to state facts in evidence which render infamous the character of her husband? We think, most clearly, that she cannot be. Public policy and established principles forbid it. This rule is founded upon the deepest and soundest principles of our nature. Principles which have grown out of those domestic relations that constitute the basis of civil society, and which are essential to the enjoyment of that confidence which should subsist between those who are connected by the nearest and dearest relations of life. To break down and impair the great principles which protect the sanctities of husband and wife would be to destroy the best solace of human existence. We think that the court erred in overruling the objections to this witness."

Now, we agree that the last two cases furnish partial support for the contention that the Knoells could assert Reuben's privilege, and could thereby exclude the testimony of Rose. But, assuming that they could assert whatever privilege Reuben had left, the question remains, What *was* left, after his plea? The principal reason given for the rule of exclusion is that public policy does not permit a wife directly to charge a crime against her husband, whether he be living or dead, because such an accusation would seriously injure the peace and harmony of the family relation if he be living, or his reputation if he be dead, and would thus weaken the foundations of society. Under the circumstances now before us, we think the contention that Rose was incompetent cannot succeed. As it seems to us, public policy ceases to apply where the husband has become his own accuser and has formally confessed the crime. The policy rests on the implication that the husband has, or may have, a guilty secret, and (either in fact or presumptively) is anxious to conceal it. His wife, therefore, will become his antagonist, or will bring reproach on his memory, if she tells what she knows, and for this reason her mouth must be closed. But, if he himself has told the story and has made a formal confession in court, the reason disappears, and in such a situation we can see no ground for holding that she may not repeat what her husband has already proclaimed to the world. By so doing she does not antagonize him, or injure his memory; the family and society are no longer in danger; and we think she may then be allowed with safety to serve the cause of justice. Before he himself spoke out, the theory of the rule protected the family relation as more sacred than justice, but after his own act has disclosed his guilt, we do not see what harm his wife can do by disclosing it again.

The general subject is thoroughly discussed in Commonwealth v. Reid, 8 Phila. 385, by Judge Paxson (then in the common pleas), who afterwards wrote the opinion of the Pennsylvania Supreme Court in Cornelius v. Hambay. And a careful consideration will also be found in 4 Wigmore, Evid. § 2227 et seq. Treating of co-indictees and co-defendants, section 2236 sums up the cases as supporting the general rule—

" * * * that the privilege covers the case of the wife of a codefendant now on trial, but not the case of the wife of a codefendant whose interest has been

removed from the record by conviction, or by acquittal, or by nolle prosequi. * * *"

See, also, the note to West Va. v. Woodrow, 2 L. R. A. (N. S.) 862.

[12] The evidence concerning the crime charged was in decided conflict, but a material part of it supported the indictment, and in such a situation the verdict of the jury is, of course, final on the facts. Apparently the plaintiffs in error have heretofore been well esteemed as merchants and as citizens, but we are bound to regard them now as guilty, and, thus regarded, they can hardly complain with much force that the reputation of some of their associates in the conspiracy may have been justly open to suspicion. If respectable men stoop to the commission of a crime, they must expect to be convicted on the testimony of other criminals.

The judgment is affirmed.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes