## THOMPSON et al. v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. January 2, 1926. Rehearing Denied January 28, 1926.)

Nos. 3615, 3616.

1. **Criminal law ⟂1137(1)—Adjournment, in which both parties acquiesced, cannot be held prejudicial.**

Adjournment taken during prosecution for conspiracy, in which both parties apparently acquiesced, cannot be *held* prejudicial, as one cannot speculate on the verdict, and later avoid .result, if unfavorable.

2. **Criminal law ⟂1036(3)—Testimony of independent transactions held admissible in conspiracy trial.**

In prosecution for conspiracy to defraud United States in building government hospitals, admission of testimony relative to independent claim filed against government, which was pending at same time and in connection with which large fee to be divided between conspirators on allowance of claim, was contemplated, *held* not reversible error, in absence of objection when offered.

3. **Criminal law ⟂423(6)—Testimony relative to transactions between conspirators relating to partially independent matters held admissible.**

In a prosecution for conspiracy to defraud United States in building hospitals, testimony of conversations and negotiations relative to payments to be made to one of conspirators for obtaining introduction and indorsements of the others to officials of republic of Colombia, with which contracts were sought, *held* properly admitted.

4. **Criminal law ⟂393(2), 395—Searches and seizures ⟂7—Government held not to have practiced fraud or deception in securing papers under subpœnas addressed to corporations although it later appeared that companies were not corporations.**

The United States was not guilty of fraud or deception, or violation of Fourth and Fifth Amendments to Constitution, in securing books and papers through subpœnas duces tecum addressed to corporations controlled by defendant, notwithstanding that it later appeared that companies were not corporations, but had been masquerading as such, contrary to Hurd's Rev. St. Ill. c. 32, § 18, and chapter 38, § 220.

5. **Criminal law ⟂692—Defendant, who has voluntarily turned over papers to grand jury, cannot afterwards insist that he was denied rights guaranteed under Constitution.**

Defendant, who, after serving of subpœnas on companies controlled by him, submitted papers to grand jury voluntarily, and courted fullest investigation, and professed a desire to co-operate with government, thereby completely waived his right to object to production of his individual papers or property, and could not later change his position and insist that he was denied rights guaranteed him by Fourth and Fifth Amendments to Constitution.

6. **Criminal law ⟂393(1)—Government is not required to advise accused of his right to claim protection guaranteed under Constitution.**

While the government may practice no deception, fraud, or duress on accused in order to obtain possession of evidence, it is not required to advise him of his right to claim protection guaranteed under Const. Amend. 5.

7. **Criminal law ⟂166½(12)—Court's suggestion that defense be called on for original of copy of telegram held not ground for reversal.**

Where, during attempt to introduce carbon copy of telegram, court suggested calling on defense for original, and later correctly stated that defendant could sit mute, and did not have to produce anything, *held*, no prejudice warranting reversal resulted therefrom.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

John W. Thompson and another were convicted of violating section 37 of the Criminal Code, and they bring separate writs of error, consolidated as one cause. Affirmed.

Elwood G. Godman and James Hamilton Lewis, both of Chicago, Ill., for plaintiffs in error.

Ralph F. Potter, of Chicago, Ill., for defendant in error.

Before EVANS, PAGE, and ANDERSON, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Defendants were convicted of violating section 37 of the Criminal Code (Comp. St. § 10201), the alleged conspiracy being to defraud the United States in the location and building of certain government hospitals.

Defendant Forbes was the director of the Veterans' Bureau, the chief of a board authorized to locate hospital sites and to let contracts for the construction of hospital buildings. Congress appropriated $17,000,-000 for this purpose. The appropriation for

this department was later increased, and the bureau, with Forbes at its head, paid out $425,000,000 in one year.

Defendant Thompson was a contractor, whose principal place of business was in St. Louis, though he transacted business in Chicago and other cities, often under different firm names. James W. Black was a contractor interested in many contracting firms, in Chicago and other places, and associated with defendant Thompson in certain contracts. The Chicago firm name was Thompson-Black Company.

Elias H. Mortimer was the chief witness for the government. He was a lobbyist, a go-between, and is described as "a fixer" for contractors who were seeking government contracts. He represented Thompson-Black, and became intimate with Forbes. His story was a full and complete recital of the details of the illegal project. He told how it started, and how it grew into concrete, definite form, fattening on corruption, and its companion, free and lavish entertainment. The details need not be recited. Mortimer testified to the actual transfer of money for corrupt purposes, the letting of at least one contract pursuant thereto, and of the plans to erect other buildings in accordance with these illegal and corrupt understandings.

Briefly outlined, the scheme contemplated the selection of sites and the building of various hospitals; the submission of bids that would include in each one $150,000 for certain of the officials and a further division of the profits; the insertion in the bid of a provision calling for early completion of the building, so that Forbes could let the contract to Black and Thompson, though they were not the lowest bidder. Mortimer's story reflects no credit upon himself. It was shockingly repulsive. But, if believed, it was sufficient, especially in view of its documentary corroboration, to support the verdict. In fact, neither defendant took the witness stand, and so Mortimer's story, in many respects, was undisputed.

The assignments of error, while numerous, are for the most part hardly worthy of serious consideration. It was only through a studied and labored effort of experienced counsel that any could be presented. This was natural, for throughout the trial the defendants met with fair or favorable rulings, and rarely could they except.

Defendants complain because the court took a recess during the trial of the cause. To borrow their own language:

"Our complaint is that * * * the trial of this case was by the court adjourned for a period of six consecutive days, from January 9th to January 15th, inclusive, during which time both the court and the jury attending to other matters than this trial. Our suggestion is that a trial by jury, guaranteed by the Constitution, is one where during reasonable hours continuous and uninterrupted attention to the vital issues of the trial in a criminal case should be given by the court and the jury. Our claim is that the return of the jury to their homes and customary avocations and businesses in the midst of the presentation of the defense by these defendants, for a period of almost a week's time, thus having their minds distracted by their own personal affairs, and their memory and recollection of testimony and incidents necessarily dimmed, and probably confused, together with the opportunity for contact with newspaper articles concerning the case, takes away from the accused the benefit of the undivided and undistracted attention to his trial which he was entitled to receive from each and every juror, and which we believe was the kind of jury trial which the Constitution guarantees."

[1] The cause for this adjournment does not appear. Apparently both parties acquiesced in it, and, we assume, for their own convenience. If an adjournment be taken during a trial without sufficient ground, either or both parties may object. But one cannot speculate on the verdict, and later avoid the result, if unfavorable. Moreover, we are unable to appreciate the ground upon which defendants base their claim of prejudice.

[2] Error is assigned over the reception of evidence which disclosed some questionable negotiations or transactions on the part of Forbes, Black, and Thompson. It is contended that they were in no way connected with the offense charged, and therefore should not have been received in evidence. From Mortimer's testimony we gather that Thompson had a large claim ($700,000) filed against the United States government, which was pending at this time. It grew out of the requisition of a boat which the government needed during the war. The government paid a price which it considered ample. Thompson asserted the sum thus allowed him was inadequate. He proposed a fee of $100,000 to be divided equally between Mortimer, Forbes, and another, contingent upon the allowance of his claim. Forbes was to get official influence back of the claim.

This testimony was received without objection. The refusal to strike it out upon mo-

tion made at the close of the trial was properly denied.

[3] Likewise it appears from the testimony of this same witness that Thompson-Black Company contemplated the securing of building contracts from the republic of Colombia, South America, and planned to use Forbes. Through him they were to meet this government's president and ambassador at Washington. With proper official introduction, and with indorsement of a very high authority at Washington, which Forbes was to secure, it was expected that large contracts might follow, and for Forbes' services a large annual salary or retainer was proposed. These conversations and negotiations respecting these two transactions were between Mortimer, Forbes, and Thompson, all participants in and parties to the alleged conspiracy. They were but a part of conversations that Mortimer related, which included the hospital contracts, the goal towards which Thompson and Mortimer were at all times striving.

Had there been proper objections to the reception of this evidence, they should have been overruled. Although appearing on its face as relating to separate matters, this transaction was involved in the conspiracy charged in the indictment. It evidenced the technique—the camouflage—the smoke screen of the briber as he approached his goal. By advancing proposals, not illegal in themselves and less offensive and repulsive than the real business upon which they were bent, the conspirators gave Forbes a colorful picture of themselves, and held out vague, but alluring, suggestions of large remuneration, and by these means ascertained Forbes' reaction to their unethical and immoral proposals. This is not a mere matter of deduction from all the evidence. It was testified to as being a part of Thompson's, Black's, and Mortimer's shameless scheme. The last-named individual said:

"Mr. Black, Mr. Thompson, and I talked the hospital situation over, and finally Mr. Black and Mr. Thompson thought it would be very advantageous for us in the hospital situation to make a proposition to Col. Forbes to represent Black and his associates down in the Colombian proposition, making him consulting engineer, in that and the others, so that we would have him in with us, *and assure getting the hospital contracts* and making it advantageous to him."

In other words, defendants reasoned that, if Forbes would sell political influence, if he would traffic in the trust and confidence and

esteem of his superior, he would accept a bribe. Doubtless the conspirators overestimated Forbes' sensitiveness, for the evidence of subsequent transactions showed that he promptly accepted the bribe when it was offered. The evidence was receivable, first because it was a part of the conversations between the conspirators, the defendants. Moreover, it was in furtherance of the conspiracy. Fahy v. U. S., 10 F.(2d) 409. No error was committed in its reception.

[4] Defendants assign error because of alleged invasion of the rights guaranteed them under the Fourth and Fifth Amendments to the Constitution. The facts are not in dispute. The government served two subpœnas —one addressed to J. W. Thompson Company, a corporation, and John Doe, its secretary, and the other addressed to Thompson-Black Company, a corporation, and to James B. Weisl, its manager. In each case the secretary thus served notified Mr. Thompson, who consulted his attorney. About a week later, the two secretaries appeared with books and papers, which they turned over to the grand jury.

The government was within its legal rights in securing through a subpœna duces tecum the papers and books of a corporation. Hale v. Henkel, 201 U. S. 43, 26 S. Ct. 370, 50 L. Ed. 652. But it later appeared that neither J. W. Thompson Company nor Thompson-Black Company was a corporation; the latter being a copartnership and the former the trade-name adopted by J. W. Thompson.

For several days after these papers were turned over to the grand jury, defendant Thompson persistently endeavored to go before the grand jury and testify. His letters written to the prosecuting attorney about this time suggest that he was acting under advice of counsel, and that he was informed on the subject of immunity. The court, following the practice recommended in Murphy v. United States (C. C. A.) 285 F. 801, heard the application for the return of the papers in the absence of the jury, and found that defendant Thompson had voluntarily delivered the papers to the grand jury.

There was no fraud nor deception practiced by the government. In each case the subpœna asked for the papers "of the corporation." Thompson knew the status of his company, as did his lawyers. He invited the very situation which arose, through his masquerading under a corporation name, contrary, not only to good business ethics, but to the statutes of Illinois as well. Rev.

Stat. Ill. (Hurd) 1921, c. 32, § 18, and chapter 38, § 220.

[5] He chose to submit the papers to the inspection of the jury. It was his voluntary action. He courted the fullest investigation, so he said, and professed a desire to co-operate with the government. After thus completely waiving his right to object to the production of his individual papers or property, he cannot later change his position and insist that he was denied rights guaranteed him by these two amendments.

There is no basis for his contention that his rights under the Fourth Amendment were invaded. There was no search or seizure of any kind made at any time. As to the Fifth Amendment, the only clause which defendant may invoke reads: "No person * * * shall be *compelled* in any criminal case to be a witness against himself."

[6] Attention must be focused on the word "compelled." While Thompson could not be "compelled" to be a witness against himself, he could *voluntarily* offer his books and papers and take the stand. To deny one the right voluntarily to testify in his own behalf would be to deny the innocent a more valuable right than the one which protects him against being compelled to be a witness against himself. While the government may practice no deception, fraud, or duress upon the accused in order to obtain possession of evidence, it was not required to advise him of his right to claim (or his right to waive) the protection guaranteed under the Fifth Amendment. Wilson v. United States, 162 U. S. 613, 16 S. Ct. 895, 40 L. Ed. 1090; Powers v. United States, 223 U. S. 313, 32 S. Ct. 281, 56 L. Ed. 448; Knoell v. United States, 239 F. 21, 152 C. C. A. 66; United States v. Wetmore (D. C.) 218 F. 227.

In such a situation as confronted Thompson, it was for him to decide whether he would be helped or hurt by refusing to produce the evidence demanded by the subpœna. In his dilemma, it seemed best to seek the advice of counsel. He did so. Thereafter he took the position that his employees should not only respond to the subpœna and produce the documents, but he volunteered to aid in the investigation and to appear himself before the grand jury. That he waived his privilege, or, to put it in another way, exercised his option (Wigmore on Evidence [2d Ed.] § 2268), to appear voluntarily, is a conclusion concerning which we have no doubt.

On the question of defendant's waiver of his rights under the Fifth Amendment, see the cases cited below.[1]

[7] Error is assigned because it is claimed the court stressed before the jury defendants' refusal to produce a certain telegram, the contents of which the government desired to prove. While in California on a trip of inspection, Forbes received a telegram from defendant Thompson. It afforded Mortimer's story some corroboration. The government experienced some difficulty in getting its contents before the jury, a copy only being in its possession. Later, however, the telegraph operator at San Francisco was sworn, and the genuineness of the carbon copy established.

The assignment of error does not deal with the correctness of the ruling which admitted the evidence. Its relevancy appears. It was the action of the court in suggesting that defendant produce the original telegram that constitutes the alleged prejudicial error. To understand better just what occurred, we quote a portion of the record. Mr. Mortimer was on the stand.

---

[1] Perlman v. United States, 247 U. S. 7, 38 S. Ct. 417, 62 L. Ed. 950; Holt v. United States, 218 U. S. 245, 31 S. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138; Johnson v. United States, 228 U. S. 457, 33 S. Ct. 572, 57 L. Ed. 919, 47 L. R. A. (N. S.) 263; Powers v. United States, 223 U. S. 303, 313, 32 S. Ct. 281, 56 L. Ed. 448; Brown v. Walker, 161 U. S. 591, 597, 16 S. Ct. 644, 40 L. Ed. 819; Burrell v. Montana, 194 U. S. 572, 24 S. Ct. 787, 48 L. Ed. 1122; Hale v. Henkel, 201 U. S. 43, 26 S. Ct. 370, 50 L. Ed. 652; Wilson v. United States, 162 U. S. 613, 16 S. Ct. 895, 40 L. Ed. 1090; Marron v. United States (C. C. A.) 8 F.(2d) 251; Levin v. United States (C. C. A.) 5 F.(2d) 598; Gatterdam v. United States (C. C. A.) 5 F.(2d) 673; Raine v. United States (C. C. A.) 299 F. 407; Howell v. United States (C. C. A.) 296 F. 911; United States v. Williams (D. C.) 295 F. 219; United States v. Sherry (D. C.) 294 F. 684; Massei v. United States (C. C. A.) 295 F. 683; Windsor v. United States (C. C. A.) 286 F. 51; United States v. Vatune (D. C.) 292 F. 497; Maldonado v. United States (C. C. A.) 284 F. 853; Dillon v. United States (C. C. A.) 279 F. 639; Murphy v. United States (C. C. A.) 285 F. 801; United States v. Barry (D. C.) 260 F. 291, 295; United States v. Maresca (D. C.) 266 F. 713; Haywood v. United States (C. C. A.) 268 F. 795; Knoell v. United States, 239 F. 16, 21, 152 C. C. A. 66; United States v. Bryant (D. C.) 245 F. 682; Linn v. United States, 234 F. 543, 148 C. C. A. 309; United States v. Skinner (D. C.) 218 F. 870; United States v. Hart (D. C.) 216 F. 374; United States v. Hart (D. C.) 214 F. 655; United States v. Collins (D. C.) 146 F. 553; In re O'Shea (D. C.) 166 F. 181; Taylor v. United States, 152 F. 7, 81 C. C. A. 197; United States v. Kimball (C. C.) 117 F. 156.

"I have seen the original of which that purports to be a copy in the Fairmount Hotel, San Francisco, the day of our arrival. It was in Col. Forbes' possession. He showed it to me.

"Mr. Crim: I will offer it in evidence.

"The Court: You might ask perhaps whether Col. Smith has the original.

"Mr. Easby-Smith: I have not, your honor. * * *

"Mr. Laughlin: We object to the introduction of this copy, on the ground that the original has not been accounted for, and the original of anything is the best evidence.

"The Court: This is a telegram addressed to whom, Mr. Crim?

"Mr. Crim: Col. Forbes.

"Mr. Laughlin: It purports to be a copy of a telegram."

After further colloquy, defendants' counsel cross-examined the witnesses, at the close of which the following occurred:

"Mr. Laughlin: Now, if your honor please, we will not make any objection to that portion of the alleged copy which this witness says he remembers. * * * As to the balance of the telegram we insist upon our objection.

"The Court: Do you take the same position, Mr. Smith?

"Mr. Smith: I join in the objection, if your honor please; that is, on that proof, I am not willing to admit that is a correct copy of the telegram."

It was at this point that the alleged improper remark of the court occurred.

"The Court: Supposing you call on the defense for the original telegram, Mr. Crim, and ask them if they can produce it?

"Mr. Godman: I would like to take an exception to that request, your honor, on the part of the defendant Forbes to produce anything. * * *

"The Court: You don't have to produce anything.

"Mr. Godman: I understand, but we take an exception to the request at this time, your honor.

"The Court: An exception to what, Mr. Godman?

"Mr. Godman: A request on the defendant Forbes to produce anything.

"Mr. Potter: No request has been made.

"The Court: I was just about to say that in a criminal case the defendant could sit mute, and did not have to produce anything. I corrected myself before you presented your objection, Mr. Godman."

But defendants' counsel insist that the

10 F.(2d)—50

court's correct statement of the law respecting defendants' right to stand mute constituted further prejudicial error. In other words, they urged that a defendant has a vested right in the court's error, and the court cannot, without prejudice to such vested right of the accused, correct its ruling. Had government's counsel made a request upon defendants for the alleged telegram, without any suggestion from the court, error would not have been necessarily committed. Defendants would have had the option of granting the request or refusing it. If they so desired, they could have asked the court to instruct the jury that they were not required to produce the telegram.

While somewhat aside from the question, we feel justified in observing that, if prejudice was injected into this case and responsibility for its introduction is sought, it must rest with counsel for defendants. They were unwilling to concede the correctness of a carbon copy of a telegram which one defendant sent to the other. Testimony as to the correctness of this copy was, however, available. To secure it, the government was obliged to send to San Francisco to get the witness. Her attendance upon the trial was obtained only at large expense. She testified that the telegram was a carbon copy of the one delivered to Forbes. That it correctly set forth the message sent by one of these co-conspirators to the other, the original of which was in the possession of Forbes, is nowhere questioned. That the jury might entertain a feeling of impatience at this highly technical procedure, which necessitated this large expense on the part of the government and a prolongation of this trial, is a most natural deduction to be made from this record. Responsibility, however, for the situation thus created, cannot be placed upon the court.

Error is assigned because the court refused to give certain requested instructions bearing on the weight of testimony given by character witnesses. These proposed instructions were very similar to those refused in the case of Allen v. United States (C. C. A.) 4 F.(2d) 688. Further discussion we deem unnecessary. The assignment of error is without merit.

Other errors are assigned (the sufficiency of the allegations of the indictment; the failure of the proof to support the venue as laid in the indictment, etc.), but we do not feel called upon to discuss each of them. Judicial precedents and authorities in abundance may be found to support the govern-

ment's position on these assignments of error.

The trial of this case consumed nearly 12 weeks, and in view of its length the record is singularly free from allegations of error. The court, not only in its rulings during the reception of evidence, but in its charge to the jury, was generously fair to defendants. The case, in its last analysis, presented issues of fact, the determination of which was solely for the jury. We are unable to find any prejudicial error.

The judgment is affirmed.