## MURPHY v. UNITED STATES, *
### and three other cases.

(Circuit Court of Appeals, Seventh Circuit.   January 2, 1923.)

Nos. 3065–3068.

1. Criminal law ⬳394—Searches and seizures ⬳7—Search and seizure without warrant illegal, and evidence so obtained inadmissible.

In the absence of any invitation or consent, defendant's home and store could not be lawfully searched, or his property seized without a search and seizure warrant, and evidence so obtained not be used against him.

2. Criminal law ⬳517(5)—Inadmissible confession cannot be divided and admitted in part.

A confession obtained under duress, or such promise of reward as to render it inadmissible, cannot be divided, and a part received and part rejected.

3. Criminal law ⬳1169(8)—Defendant cannot complain of admission of part of confession, where the whole confession was admissible.

If the court erred in not receiving an entire confession the admission of part of it was not error of which defendant can complain.

4. Criminal law ⬳531(1)—Confession presumed voluntary.

It is not the law that there is a presumption against a confession, that the government carries a heavy burden in establishing its voluntary character, and that this burden is not met if there is any evidence tending to impeach the testimony of those securing it; and the confession should be given the presumption that it was voluntarily made.

5. Criminal law ⬳519(1)—Confessions must be free and voluntary; "voluntary confession."

Confessions, to be admissible, must be voluntary; that is, their making must express the free will of defendant, and they must not be induced by threat or promise; but a confession may be voluntary, though suggested by a third person.

[Ed. Note.—For other definitions, see Word and Phrases, First and Second Series, Voluntary Confession.]

6. Criminal law ⬳532(½)—Test of admissibility of confession is testimonial unworthiness.

The test of admissibility of a confession is not the weight of the testimony or the credibility of the witness, but the testimonial unworthiness of the confession, and while it is the duty of the court to exercise care and caution in investigating the surrounding circumstances, it need only determine whether such circumstances make the confession testimonially unworthy.

7. Criminal law ⬳736(2)—Disputes as to whether confession voluntary to be determined by jury.

Disputes between the witnesses as to whether a confession was voluntary must, like other controverted issues, be left for the determination of the jury.

8. Criminal law ⬳531(½)—That prisoner recants confession or charges fraud does not render it inadmissible, unless supported by proof.

That accused recants and disavows confession, and charges fraud in its procurement, cannot affect its admissibility, unless supported by proof.

9. Criminal law ⬳532(½)—Careful investigation of circumstances surrounding confession to be made.

In passing on the admissibility of a confession, a careful investigation into the circumstances surrounding its giving must be made, and the age, experience, and intelligence of accused ascertained.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

285 F.—51        *Certiorari denied 43 Sup. Ct. 362, 67 L. Ed. ——.

10. **Criminal law ⬅⟹531(4)—Defendant may contradict confession or give evidence bearing on its weight or effect.**

After a confession is received, accused may give testimony before the jury showing the falsity of the statements contained in the confession, and any other evidence bearing on its weight or effect.

11. **Criminal law ⬅⟹1043(3)—Defendant's claim on trial held inconsistent with claim of coercion, or inducement in obtaining confession.**

Defendant's claim on the trial that, when a confession was made, it was made as that of another conspirator, and that he was sleepy and hungry, and merely answered questions by a nod or shake of the head, or by "yes" or "no," without knowing or caring what the answers were, was entirely inconsistent with his claim in the reviewing court of coercion and inducement.

12. **Criminal law ⬅⟹522(1)—Urging defendant to tell the truth or be frank held not to disqualify confession.**

While statements to defendant that he had better tell the truth, or be frank, or that it would be best for him to tell the truth, may, under certain circumstances, constitute a veiled threat, or an inducement or promise of help, standing alone they do not disqualify the confession made pursuant thereto.

13. **Criminal law ⬅⟹531(3)—Evidence held to show confession voluntary.**

Evidence *held* to show that a defendant's confession was voluntary, and not made by reason of coercion or inducement.

14. **Criminal law ⬅⟹519(9)—Confession not involuntary, because suspected persons interrogated by officers, when left free to deny implication or refuse to answer.**

While post office inspectors, endeavoring to locate the parties holding up and robbing a mail truck, may not overstep the limits prescribed by the Constitution or acts of Congress, they may ask questions and search for evidence of guilt, and, when they have secured confessions and recovered stolen property, may interrogate persons thereby implicated, or on whom suspicion rests, and, so long as the persons interrogated are left free to refuse to answer, or deny all part in the transaction, the resulting confession is admissible in evidence.

15. **Criminal law ⬅⟹202(1)—Conspiracies to rob mail trucks on different dates held separate offenses.**

Where, after the failure of a conspiracy to rob a certain mail truck of its mail pouches on March 30th, the parties conceived a new scheme to rob such a truck on April 6th, and the pouches and their contents were necessarily different, while the trucks and the employees in charge may have been different, and the conspirators may not all have been the same, the conspiracies are separate offenses, and will support separate sentences.

16. **Criminal law ⬅⟹202(1)—Test as to identity of offenses stated.**

It is not the similarity in most of the facts that determines whether offenses are separate, but the presence of a fact necessary in one offense and absent in another.

17. **Criminal law ⬅⟹423(3)—Evidence of accused's possession of revolver when arrested admissible, when conspiracy not then ended.**

On trial for conspiracy to hold up and rob mail trucks and conceal the stolen property, evidence that one of the defendants, when arrested, carried an automatic revolver, *held* admissible, where the conspiracy to conceal the stolen property was not then at an end; it being inferable that it was being used in furtherance of such conspiracy.

## On Rehearing.

18. **Criminal law ⬅⟹202(1)—Separate convictions and sentences for conspiracy to rob and to conceal stolen property unauthorized, when there is but one conspiracy.**

Where the evidence establishes conclusively that there was but one conspiracy to hold up and rob a mail truck, and to have and conceal the

⬅⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

stolen property, there cannot be separate convictions and sentences for conspiracy to rob the mail truck and conspiracy to have and conceal the stolen property, in view of Const. Amend. 5, prohibiting double punishment for the same offenses.

19. **Criminal law ⊂⊃161—Evidence, and not theory of pleader, determines question of double punishment.**

The enforcement and application of Const. Amend. 5, prohibiting double punishment, demand a practical and not a theoretical test, and it is the evidence, and not the theory of the pleader, from which the issue must be determined.

20. **Criminal law ⊂⊃163—Defendant entitled to be protected against double punishment, regardless of kind or magnitude of offense.**

One accused of crime, regardless of the kind or magnitude of the offense, is entitled to the protection of Const. Amend. 5, prohibiting double punishment for the same offense.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Timothy D. Murphy, Vincenzo Cosmano, Paul Volanti, and Edward C. Gierum were convicted of conspiracy, and they bring error. Reversed as to Volanti, affirmed as to Cosmano and Gierum, and modified on rehearing as to Murphy.

Two indictments were returned against defendants, which were consolidated upon the trial. Of the eight counts thus included, three were for conspiracy, and five were for the substantive offenses. Of the latter five all defendants were acquitted. Defendant Murphy was convicted on all three remaining counts, Cosmano and Gierum on two of the conspiracy counts, and Paul Volanti on one conspiracy count. The maximum sentence permitted under the statute was pronounced against each defendant on each count on which he was indicted.

The conspiracy counts (for convenience hereafter referred to in the order named) charged the defendants with conspiracy: (1) To violate section 194 of the penal law (Comp. St. § 10364), which makes unlawful the possession and concealment of a government mail bag stolen from the government; (2) to violate section 197 of the Criminal Code (Comp. St. § 10367), which makes it unlawful for any person to rob a government employee having lawful custody of the mail; and (3) same as (2), except on a different occasion.

The government's case included the testimony of accomplices who took part in the robbery, the stolen property, or part of it, testimony as to the circumstances under which the property was recovered. These accomplices told a story of a plan, conceived in the latter part of March, 1921, to rob the mail; that a former government mail clerk furnished the information concerning the transportation of large sums of money through the mail, the method of handling the bags containing the money and securities, and other details necessary to the success of the undertaking. Teter, the government employee, and Hecker, with whom he was at the time employed in some promotion scheme in Indianapolis, testified for the government, and Gierum made a full confession, which, however, was excluded, when offered in evidence, because of the circumstances surrounding its making.

It was testified that Hecker met Murphy in 1920 in jail, where the project and its possibilities were first discussed. Later in Indianapolis Hecker saw Murphy again, and Murphy learned that he and Teter were interested in a business enterprise which at that time was rapidly approaching disaster. On this occasion Murphy was accompanied by two of his associates, and, after some negotiations in regard to the projected robbery, Hecker and Teter accepted Murphy's proposal that they come to Chicago, which they did shortly thereafter, where the plans were then perfected, and the details for their execution arranged. All defendants save Volanti were at this time identified and connected with the plot.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The parties visited the vicinity of the Polk street station, where, from a concealed position, they observed how the government mail truck reached the depot, learned of the existence and use of certain trucks to carry registered mail pouches, and observed the precautions taken by the government to prevent theft or loss. Their plans rapidly matured and March 30, about 5:30 p. m., was fixed as the date for the robbery, and an automobile was stolen and on hand to carry away "the loot." Teter, standing on the corner of Polk and Clark streets, was to raise his hat as the government truck turned off on Federal street, and Hecker, waiting for the signal, was to repeat it for Gierum, who was in the stolen car headed south toward the unloading platform. The men who were to commit the robbery were to be stationed near the unloading station. The plans miscarried, though all were in readiness, and the first two named parties gave their signals. Murphy expressed disappointment over the failure of his highwaymen "to come through," but said they would the next time, or he would get another crew. Teter and Hecker returned to Indianapolis, Murphy giving them a check for $100, and arrangements were made for their return in time to participate in the second conspiracy, the time of its consummation being later fixed at the same hour and place, but on April 6. The plans were similar to those adopted in the first plot.

On this occasion the plans were carried out with clocklike precision. The four hold-up men rushed out when the stolen Cadillac car stopped in front of the mail truck, and at the point of revolvers made the men in charge of the truck and the registered mail pouch hold up their hands. The registered mail pouch and two unregistered pouches were taken from the government truck, put in the stolen Cadillac, and rapidly carried away to the South Side of the city. Gierum, who drove the stolen car, was identified by witnesses. The car number was taken, and later the car was seen on the South Side. The number corresponded with a Cadillac stolen March 30 and belonging to one Wakem. The empty mail pouches were found that evening in the southwest part of the city, cut open and rifled.

The registered mail bag contained Liberty Bonds of the par value of $329,-000, and the recovered pouch was identified, because the wrappers in which the securities were placed were found with the bag. In addition to the Liberty Bonds, there were six packages, each containing $4,000 in currency, and in the bag, or near by, were the empty paper containers that held this money. The identity of the bags and the dollar bills and the Liberty Bonds was established by numerous witnesses and may be said to be undisputed. Following the robbery the parties all sought an early division of the "booty," but Murphy explained that he had first put it in "a lot of tomato boxes in a grocery store on the South Side; that he would soon move it to another place and put it in a trunk for safe-keeping"; and a few days later Murphy told Hecker that it had been placed in a trunk and moved to the home of a relative on the South Side.

On April 9th a partial division of the stolen property was made. Murphy turned over two packages to Hecker, one containing 13 $1,000 Liberty Bonds and 1,500 $1 bills, and the other containing a like amount of bonds but only 1,000 $1 bills. Hecker gave one package to Teter, together with a revolver which Murphy asked him to deliver. Teter then went back to work on the mail train. On May 31 Teter was arrested at Chicago, just before leaving the mail car upon which he arrived, and there was found in his possession a few of the $1 bills and 10 of the $1,000 Liberty Bonds. Later 200 of the $1 bills were found with his wife, and he gave information which lead to the discovery of 800 of the $1 bills. About the same time Hecker was arrested in New York, and he, too, gave a statement of his connection with the robbery, and on June 13, Murphy, Cosmano, and Gierum were placed under arrest. Among Murphy's keys was one which he claimed was for a trunk at his father-in-law's, 857 West Fiftieth street, to which place government officials went at once and closely guarded it. Murphy protested that the trunk contained only whisky, but after the lapse of some hours, when he learned that the officers were waiting for morning to obtain a search warrant, he consented that the trunk be opened, and admitted it contained money. The house was then entered, the trunk found in the attic, but only $4,000 in money

was obtained. A further search of the premises was undertaken, and on the roof of the adjoining building there was found $14,803 in cash and $98,600 in Liberty Bonds. The money and the bonds were identified as having been in the stolen registered mail pouch.

Gierum upon his arrest was taken by the government inspectors to the post office, where he later made a full confession, which he repeated the next day. He later repudiated the statement, and on the trial it was contended that the confession was not admissible, and the objection was sustained. A further statement of the circumstances surrounding its execution will appear in the opinion, when the correctness of that ruling is reviewed.

In this confession the defendant Volanti was involved. When it was being given, at about 3:30 a. m., Gierum took the secret service men over the route which he told them he pursued when he drove the Cadillac with the stolen mail pouches on April 6. Volanti being thus involved by Gierum's statement, the officers at once raided his place without a search warrant, and his mother, an elderly lady, in answer to questions, informed the searchers where to find the till, and four of the $1 bills taken from the stolen mail pouch were found therein, and taken away and used on the trial. Volanti was then taken to jail, but stoutly maintained his innocence. He assigns numerous errors, to support which a long statement of facts is necessary. This will not be attempted, in view of the conclusion reached respecting the seizure and subsequent use of the 4 $1 bills found in his till.

The errors assigned are directed to : (a) The insufficiency of the indictment; (b) the three conspiracy counts describing but one offense; (c) errors in admission of evidence; (d) errors in the court's charge to the jury; (e) error in imposing punishment under each count of an indictment, when, as claimed each count charged the same offense.

James J. Barbour, of Chicago, Ill., for plaintiffs in error Murphy and Gierum.

Benjamin P. Epstein, of Chicago, Ill., for plaintiff in error Cosmano.

Francis Borrelli, of Chicago, Ill., for plaintiff in error Volanti.

Charles F. Clyne and John E. Northup, both of Chicago, Ill., for the United States.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

EVAN A. EVANS, Circuit Judge (after stating the facts as above). As each defendant has separate assignments of error, and the position of each is different from that of his alleged co-conspirator, it becomes necessary to approach each assignment of error from the point of view of each defendant.

[1] Volanti's contention that the money taken from the till in his store (4 of the $1 bills originally in the stolen mail pouch) without a search warrant could not be used as evidence against him is so well taken that discussion is unnecessary. It is elementary that the defendant's home and his store cannot be lawfully searched or his property seized without a search and seizure warrant. Boyd v. U. S., 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746; Weeks v. U. S., 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177; Gouled v. U. S., 255 U. S. 298, 41 Sup. Ct. 261, 65 L. Ed. 647. Nor does the evidence justify any possible contention that the entry and seizure of the property was upon invitation of Volanti, or with his consent. As to Volanti, the judgment must be reversed, and his other assignments of error may be ignored.

As to Gierum, it is claimed that error was committed in admitting part of the confession after the court had ruled the entire confession was inadmissible. In other words, the court refused to receive the confession, but permitted the government to show that Gierum, *when*

*making the confession*, took the inspectors over the route he then stated he followed on the afternoon of the robbery, and to the store of Volanti where it was claimed the stolen property was first "planted." This ruling, if erroneous, would necessitate a reversal as to Gierum; and, inasmuch as in the opening statement to the jury for the government extended reference was made to this confession, and also in its closing argument elaborated thereon, it is claimed that all defendants were prejudiced thereby. Its importance in disposing of the writ of error can readily be appreciated.

[2, 3] We agree with defendant's counsel that a confession obtained under duress or such promise of reward as to render it inadmissible cannot be divided, and a part received and a part rejected. If it was error to receive the entire confession, we think it was error to receive a part of it. At least this is so under the circumstances here disclosed, and as to Gierum it would constitute reversible error. On the other hand, it must also be admitted that, if the court erred in not receiving the entire confession, the admission of a part of it was not error of which the defendant can complain.

When the question of admission of this confession arose, the court withdrew the jury and preliminarily took up the question of its admission. The government offered the evidence of its inspectors and made a showing that the confession was voluntary. No suggestion of coercion or deception appeared. Our attention is not now called to a single bit of evidence upon which a finding of coercion, promise, or deception was made in the testimony of these witnesses. Defendant's counsel rely solely upon the decision of the learned District Judge, from whose reasons given for reaching the conclusion that the confession was not voluntary we quote:

"Now, it is my duty to say at the outset that any disposition of this motion is altogether on the theory that Gierum is the most willing perjurer that I have seen in 17 years' service on this bench. He will say anything, at any time, in reply to any question, on any subject, if it is even temporarily calculated to get him by, and how he has escaped the penitentiary this long is a source of amazement to me, utter astonishment. His answers from his chair, I could see, filled his own counsel and his counsel's associates in this case with utter amazement, not at the willingness of the man's perjury, but at its hopeless stupidity. So my disposition of this case is on the theory that whatever the defendant Gierum said cannot be recognized as meaning anything here, except possibly the reverse of the truth. I must dispose of this matter on the testimony of the post office inspectors.

"The rule is, under the amendments to the Constitution protecting a citizen against self-incrimination, that a thing called a confession, to be accepted in a case, must affirmatively appear to have been voluntarily made. To put it bluntly, the rule is that there is a presumption against a thing called a confession. I did not make that rule. I did not interpret that rule of the Constitution, but courts that have the authority, that write rules that I must obey, have laid it down in such words. I say the meaning of that decision is that there is a presumption against the integrity of a thing called a confession because it requires an affirmative showing establishing its admissibility, its voluntary character. * * *

"Now, until a careful examination of this Bram Case, 168 U. S. 532, 18 Sup. Ct. 183, 42 L. Ed. 568, even all those things would not have induced me to sustain the objection, but the Supreme Court of the United States has closed the door against any discretion in this matter. The reversal of the conviction in the Bram Case was on account of a point possessing not one-tenth the merits that this objection has here. Yet they set aside that judgment of conviction and ordered a new trial, for reasons that did not in that case weigh an ounce where the facts here weighed pounds. I want no misunderstanding

in any quarter about this. To follow it out to its logical conclusion, I don't know what a post office inspector is going to do in the enforcement of law in dealing with criminals. I don't know. It is not with any particular enthusiasm that I sustain this objection, but I do sustain it; there being no discretion left to me from the decision in the Bram Case."

[4, 5] Both counsel for defendants and the District Court labored under the erroneous impression that there was a presumption against a confession, that it was presumptively inadmissible, and that the government carried a heavy burden in establishing the voluntary character of such a statement, which burden was not met, if there was any evidence tending to impeach the statement of those who secured the statement. We do not understand such to be the law. The very earliest cases laid down the rule that confessions made by one accused of a crime were receivable in evidence, even though procured by torture. Ammons v. State, 80 Miss. 592, 32 South. 9, 18 L. R. A. (N. S.) 771, 92 Am. St. Rep. 607; State v. Sherman, 35 Mont. 512, 90 Pac. 981, 119 Am. St. Rep. 69. But the harshness of this rule was early abated, and courts have now universally adopted the policy of rejecting statements made under duress, or induced by the hope of promised benefit. In other words, confessions must be voluntary; that is to say, their making must express the free will of the defendant; they must not be induced by a threat or promise.

The suggestion may, of course, come from a third party, and the resulting statement may yet be voluntary. In other words, trials are conducted that the truth may be ascertained. Admissions are, when freely made, competent evidence. In fact, they may be most persuasive evidence. Sparf v. U. S., 156 U. S. 51, 15 Sup. Ct. 273, 39 L. Ed. 343. If, however, the surrounding circumstances invite the belief that the confessor was *in fear*, or was actuated by promised reward or favor, the confession should be excluded, because testimonially unworthy.

[6-8] It is this latter test, testimonial unworthiness, that should determine inadmissibility, and it is rather difficult to understand why there should have arisen such confusion and such conflict of authority over this question of evidence. Bearing in mind that the test of admissibility is not the weight of the testimony nor the credibility of the witness, no good reason can be advanced in favor of applying a different rule respecting admissions in criminal cases than exists in civil cases. To call an admission a confession does not detract from the reasons that render either admissible in evidence. A statement in writing, duly signed and its execution established, is ordinarily admissible in evidence, if the contents are relevant to the issues in dispute. If its execution is challenged on account of duress, or its admission disputed because fraud was practiced in its securement, or its reduction to writing was incorrect, then a new issue is raised. Because of the precautions which courts take to protect the accused on trial in a criminal case, it may be conceded that the duty of the court to investigate the circumstances surrounding the execution of the confession is one demanding care and caution. But, after all, the court must only determine whether the surrounding circumstances make the document (if

it be in writing) testimonially untrustworthy. Disputes between the witnesses must, like other controverted issues, be left for the determination of the jury. The fact that the accused recants after making the statement, and disavows his confession, and charges fraud in its securement, cannot, and should not, unless supported by proof, affect its admissibility. For if its reception in evidence will tend to make more certain a true verdict, justice will thereby be promoted, and trials are for the purpose of convicting the guilty as well as acquitting the innocent.

With these general observations, we can proceed to an examination of the evidence in the case before us. In doing so we must give to this statement by Gierum, contrary to what was done in the District Court by the learned trial judge, the presumption to which it is entitled, the presumption that it was voluntarily made. For collection of cases see Wilson v. U. S., 162 U. S. 613, 16 Sup. Ct. 895, 40 L. Ed. 1090; 18 L. R. A. (N. S.) 783; 1 R. C. L. 580.

[9] It may also be conceded that it is for the court to determine preliminarily the admissibility of the evidence, and this should be done, as was done in this case, by the trial judge in the absence of the jury. A careful investigation into the circumstances surrounding its giving must be had, and the age and experience and intelligence of the accused ascertained. For one without experience, possessed of little knowledge, may be more readily intimidated and more quickly influenced by threats or offers of reward than those possessing more experience and greater fortitude.

[10] Moreover, it may be conceded (notwithstanding there are cases holding the contrary—State v. Wells, 35 Utah, 400, 100 Pac. 681, 136 Am. St. Rep. 1059, 19 Ann. Cas. 631; Ellis v. State, 65 Miss. 44, 3 South. 188, 7 Am. St. Rep. 634) that it is the province of the court, and not of the jury, to determine the admissibility of such evidence. After the confession is received, if the court so holds, the accused may give testimony before the jury showing the falsity of the statements contained in the admission, and any other evidence bearing upon the weight or effect of the confession. Wilson v. U. S. supra.

Conceding, then, that it was for the court to determine the admissibility of the evidence in the first instance, and for the jury to determine its weight, it is first to be observed that the court erroneously cast upon the government the burden of proving the voluntary character of the statement. But, passing that error, and examining the testimony, which is far too long to be set forth in full, it appears that neither threat nor coercion was attempted. *None is now charged.* If the confession is not voluntary, it is because it was induced by hope of reward offered by the inspectors.

[11] It is interesting to note here that no such claim was seriously made by defendant. His position was that the statement made was the statement of the co-conspirator, Hecker. Gierum says he was sleepy and hungry, adding that he merely answered questions, mostly "by a nod or shake of the head," or by "yes" or "no"; that he did not know nor care what the answers were.

This claim is most significant on the question of coercion and induce-

ment. It is entirely inconsistent therewith. Had the defendant assumed the burden which rested upon him, his testimony would not have suggested either inducement or coercion, but merely ignorance of the proceedings taken, and failure to comprehend the significance of the statement made, and the correctness of the answers given. Such a position would have been fatal, for not only was there a confession made during the night, but a second one, a more full and complete one, was made the next day, and it was taken by a stenographer, and after the witness had been again fed, had rested, and had visited with his wife. This statement, covering some 28 pages, given in narrative form, rather conclusively negatives Gierum's claim that he was ignorant of its contents and indifferent to the answers he made to the questions propounded. That one could have been induced to make a statement upon promised favors or rewards seems hardly possible, where the witness said, as here:

"I don't remember what was said early in the morning, between 2 o'clock and 5 a. m. I didn't say anything. Hecker was doing the talking and the answering. I simply said yes or no.

"Q. Why did you say yes, and no, or anything of that kind? A. I was too tired and too sleepy. I wanted to get some sleep, and was hungry. I had been up two nights and two days. That was the only reason I made the answers I did at that time. I am not now able to give the court any intelligent statement of what I did say there at that time. ° ° ° I saw a man talking to Mr. Hecker—I saw several men talking to Mr. Hecker. I saw several men writing. I don't know what they were writing. They were questioning Hecker, and every once in a while they would talk over to me, and ask me if that was right. I did see some man writing down what was being said. He was sitting across the room, probably the length of the desk here from me, next to Hecker. The other man was next to him, and I was sitting on the opposite side, and every once in a while some one of them would holler over and ask me if that was right. Sometimes they would have to shake me up to get me to answer. I was sitting 12 or 15 feet across from the man that was writing, and Hecker probably 4 or 5 feet away from that man. Then they took me down in an automobile, down on Wallace street."

Turning, now, to the testimony of the government inspectors, it appears that experienced men in the department, with a record entitling them to credit for truthfulness and faithfulness, were on the case; that they had what they believed was the full story of the crime; that they had the confession of two men who were active in the holdup; that they had the testimony of witnesses who were able to identify Gierum as the driver of the stolen Cadillac on April 6; and that they were desirous of confirming this proof, of corroborating their other witnesses. Gierum was arrested and taken to the Post Office Building, where he was asked to make a statement, which he refused to do. The request was repeated during the evening, and each time it was made it was refused. Finally Hecker asked to go into the cell with Gierum and about 1:30 there was a call and the officers were informed that Gierum was willing to tell all. Hecker was warned against offering any inducements or making any threats before he entered the cell, and it does not appear that any were made. Hecker did not testify as to what he said in the cell with Gierum, but the latter stated it was Hecker's, and not his, confession that was taken.

Even though no statement from the court, giving his estimate of

Gierum's testimony, appeared, it is apparent from a reading thereof in the light of all the other testimony that, where it disputes the numerous witnesses who testified for the government, and where it disputes the written statement taken by the stenographer the following day, it was not only unbelievable, but certainly not sufficient for any such reason to be excluded. Furthermore, the court did not exclude the confession because of dispute in the testimony, or because of any evidence given by Gierum, who he said was untruthful, and his testimony entitled to no weight; but he excluded it solely upon the testimony of the inspectors, and upon the authority of the Bram Case. It is therefore necessary that this testimony be carefully examined.

Inspector Hitchcock stated that he heard a noise in the cell previous to Gierum's making the statement and he went to ascertain what was wanted. *Gierum asked him "if he [Gierum] would tell the truth whether the inspectors would promise him anything," and the witness said, "No."* Gierum then said he was ready to make a statement, and witness unlocked the door and led him out. He further said Gierum made "his statement without questions, and they went slow, as Inspector Utley wrote it all out in longhand."

Inspector Utley stated that he wrote down the statement; that Gierum was not questioned, but made the statement in the narrative form; that he manifested no fatigue; that while making the confession there was an intermission, during which time Gierum and others went over the route followed the day of the robbery, when Gierum was driving the car with the stolen mail pouches; that upon his return he resumed his statement.

Inspector Germer, being in charge of the Chicago division, stated that he was very careful to tell Gierum that he could make him no promises, denying specifically that he offered to give him "the street" if he made a statement. He denies that he said, "We don't want you; we want Murphy and Cosmano." He stated that during the evening Gierum was taken from the cell, and several chauffeurs who were at the Polk street station on April 6 permitted to see him, to ascertain whether they recognized him as the driver of the stolen Cadillac. About midnight Gierum was again brought out, and shown the money and bonds, which had been obtained from Murphy, some $114,000, and Germer said, showing the money and bonds, "That is what we got from Murphy. What was your share?" Gierum replied, "I have nothing to say." Witness was also present when the statement was made before the stenographer the next day. Gierum was told by the assistant district attorney that the statement would have to be made without any promises, and that it could be used against him, and then asked Gierum if he thoroughly understood it, and Gierum replied in the affirmative.

"The district attorney in my presence over at the jail informed him what the penalty was for robbing the mail, and what it was for holding up a government employee carrying the mail. * * * He asked if he could be confined pending the trial away from Chicago, and was told he could not."

On cross-examination, the testimony to which the District Judge referred was given, and it is here quoted in full:

"Q. Well, before you had informed him that a chauffeur had identified him, didn't you tell him that he had better tell the truth about it? A. I told him that I wanted him to tell the truth. I expect I told him he had better tell the truth; better be frank.

"Q. What did you say? A. Better be frank; tell the truth.

"Q. And how many times did you say to him that he had better tell the truth, or better be frank? A. I did not tell it very often, because I did not talk to him very long. I only talked to him on two occasions that evening. He did not make any admission until after I had told him this. Mr. Hecker was brought in to where Gierum was about 2 o'clock in the morning from the Majestic Hotel. I went over to the hotel, and some one asked what Gierum had to say for himself, and I said, 'He don't want to talk.' Hecker heard the conversation, and said he would like to talk to Gierum. I said, 'If you want to talk to him, I will take you over there;' and I took him over there, and on the way over, I said: 'Now, if you talk to this man, tell him to tell the truth; but you must be careful what you say to him. Don't say anything beyond that.' I told him that, whatever he was to say to him, he was to tell him the truth."

Inspector Fahy denied making any offers or inducements, or that any one else made them in his hearing.

Witness Goldsmith testified that he was the stenographer who took the statement the next day, and had his notes, the correctness of which were conceded; that Gierum was given to understand that he would receive no advantage by making the statement, and also that all questions and answers were understood.

From the foregoing, it is apparent that the Germer statement, "You better be frank," is the sole basis for defendant's contention of improper inducement offered Gierum for making the confession.

[12, 13] The expressions, "better tell the truth," and "better be frank," and "it will be best for you to tell the truth," have been before the courts on many occasions, and the majority have held them not sufficient to defeat the admission of the confession. Kelly v. State, 72 Ala. 244; State v. Kornstett, 62 Kan. 221, 61 Pac. 805; State v. Staley, 14 Minn. 105 (Gil. 75); State v. Anderson, 96 Mo. 241, 9 S. W. 636; Heldt v. State, 20 Neb. 496, 30 N. W. 626, 57 Am. Rep. 835; Hintz v. Wisconsin, 125 Wis. 405, 104 N. W. 110. But it must be admitted that such language, *coupled with other statements*, may be so construed as to make resulting admissions incompetent. Such statements might under certain circumstances constitute "a veiled threat," or "an inducement," or a "promise of later help." But, standing alone and not otherwise qualified, they are not accepted as disqualifying a confession made pursuant thereto.

But it is unfair to the defendant and to the government to measure the words alone—disassociated from the rest of the conversation. Was there something else said to defendant that caused him to believe the inspectors would use their efforts to temper the judgment that the court would later pronounce? Or did the defendant say aught that made more certain and less ambiguous the meaning of the words "better be frank"? We think there was. The testimony of Inspector Hitchcock cannot be ignored. He it was that answered defendant's call to come to the cell. Inquiring as to the purpose of the call, Gierum asked him, "if he [Gierum] told the truth, whether we would promise him anything." Witness said, "I told him, 'No.' "

This question clearly indicates defendant's character; it refutes any theory of his being an innocent, timid or, unsophisticated individual, for the first time in the toils of the criminal law, and frightened and awed by his surroundings. Rather it bespeaks the cool and calculating criminal mind, trying to barter with the officers of the law. He was not deceived by the government's position, for the brief but definite "No" left no room for any claim of ambiguity or uncertainty. Defendant's reply, made immediately thereafter, that he "was ready to make a statement," now forecloses any successful attempt to assert that another inspector, at another time, lured him on by the statement, "better be frank."

Nor can we overlook the second statement made by the defendant (which was the one offered in evidence) and the testimony of numerous witnesses, supported by the shorthand notes of the stenographer bearing on its execution. Between the making of the two statements defendant had an opportunity to rest, was again fed, and visited with his wife. Even though we assume that such influences as actuated the first statement were still present, we cannot ignore the corroboration which is thus given the testimony of the government's witnesses, nor can we overlook the absolute contradiction there afforded to defendant's hopeless explanation of the occurrence on the witness stand, a part of which only has been quoted.

As to matters in dispute, this testimony supports the court's conclusion concerning Gierum's story, and lends added faith and credit to the statement of the government inspectors who took the confession, and whose character and standing, unattacked in this case, greatly strengthen the presumption that existed in favor of the voluntary character of this statement. Nor do we think the Bram Case, 168 U. S. 532, 18 Sup. Ct. 183, 42 L. Ed. 568, controls the present one. That decision went no further than the facts in that case. It recognized the admissibility of confessions, citing Hopt v. Utah, 110 U. S. 574, 4 Sup. Ct. 202, 28 L. Ed. 262, and Sparf v. U. S., 156 U. S. 51, 15 Sup. Ct. 273, 39 L. Ed. 343, but held, upon the facts there shown, the confession was not voluntary. Describing the facts, the court said:

"The crime had been committed on the high seas. Brown, immediately after the homicide, had been arrested by the crew in consequence of suspicion aroused against him, and had been by them placed in irons. As the vessel came in sight of land, and was approaching Halifax, the suspicions of the crew having been also directed to Bram, he was arrested by them and placed in irons. On reaching port these two suspected persons were delivered to the custody of the police authorities of Halifax, and were there held in confinement awaiting the action of the United States consul, which was to determine whether the suspicions which had caused the arrest justified the sending of one or both of the prisoners into the United States for formal charge and trial. Before this examination had taken place, the police detective caused Bram to be brought from jail to his private office, and when there alone with the detective *he was stripped of his clothing*, and either whilst the detective was in the act of stripping him, or after he was denuded, the conversation offered as a confession took place."

What significance must be given to the words "he was stripped of his clothing," which Justice White emphasized by italics? When one accused of murder on the high seas is brought before a police officer in

a foreign port, what deductions can be drawn from being stripped of his clothing prior to a demand for a confession? Could he, or any other person, conclude other than that a flogging would be inflicted if the statement was not satisfactory? Is there any comparison between such facts and those in the present case? We see none. As Mr. Justice White said:

"And these self-evident deductions are greatly strengthened by considering the place where the statements were made and the conduct of the detective towards the accused. Bram had been brought from confinement to the office of the detective, and there, when alone with him in a foreign land, while he was in the act of being stripped or had been stripped of his clothing, was interrogated by the officer, who was thus, while putting the questions and receiving answers thereto, exercising complete authority and control over the person he was interrogating. Although these facts may not, when isolated each from the other, be sufficient to warrant the inference that an influence compelling a statement had been exerted, yet when taken as a whole, in connection with the nature of the communication made, they give room to the strongest inference that the statements of Bram were not made by one who in law could be considered a free agent. To communicate to a person suspected of the commission of crime the fact that his cosuspect has stated that he has seen him commit the offense, to make this statement to him under circumstances which call imperatively for an admission or denial, and to accompany the communication with conduct which necessarily perturbs the mind and engenders confusion of thought, and then to use the denial made by the person so situated as a confession, because of the form in which the denial is made, is not only to compel the reply, but to produce the confusion of words supposed to be found in it, and then use statements thus brought into being for the conviction of the accused."

Not only did the accused act under conditions which "perturbed the mind," but he made a denial which contained a negative pregnant, and it was this latter statement that was construed as a confession. There was fully as much justification for rejecting this statement, because of the confusion over its meaning, as there was in rejecting it for the circumstances under which it was given.

[14] It is not necessary that an offer to confess must be "thrice refused," or that the party to whom the confession is made do all within his power to prevent the statement. Rather should it be said that it was the duty of Chief Inspector Germer and his assistants to discover who it was, in broad daylight, in the busiest part of Chicago, held up the government mail truck, and robbed it of $300,000. It is true, in so endeavoring to locate the guilty parties, the officers are not permitted to overstep the limits prescribed by the Constitution or the acts of Congress. They are, however, permitted to ask questions, search for evidence of guilt wherever the clews lead them. When they secured the confession of two of the participants and recovered a large part of the stolen property, they were permitted to interrogate, and justified in inquiring of those who were implicated in the story told by the others, or upon whom suspicion rested by reason of the recovery of the stolen property. If such persons thus interrogated chose, they could refuse to answer, or they could deny all part in the transaction, or they could admit their guilt, if participants. And so long as the officers, as we conclude was done in this case, left it to the defendant to determine freely and voluntarily what course he should take, the resulting confession was admissible in evidence.

It follows from what has been said that the court did not err in receiving a part of the confession, but should have admitted the entire statement; but of this latter error defendant, of course, cannot complain.

[15, 16] The several assignments of error directed to the alleged similarity of offenses charged in the three conspiracy counts may be disposed of together. Were it not for the earnestness of counsel in presenting these assignments, we would, in view of the discussion in Snitkin v. U. S. (C. C. A.) 265 Fed. 489, where we had occasion to consider a somewhat similar question, hardly consider them seriously; for we are at a total loss to understand how a conspiracy to rob a certain mail truck of its mail pouches on March 30th could be the same offense as a conspiracy to rob a certain mail truck of its mail pouches on April 6th. The valuables in the pouches on the mail truck were not the same on the two occasions; the pouches were different; the trucks would be, or at least may have been, different; the government employees were not the same, and the parties to the conspiracy may not have been, and doubtless were not, the same. Not that all these differences are necessary to distinguish the two offenses, but we point them out to show how different might be the evidence in the two cases. It is not the great similarity in most of the facts constituting the separate offenses that determines this question, but the presence of a fact necessary in one offense and absent in another that determines whether the offenses are different. When defendants' plans failed March 30, one conspiracy was at an end. If nothing more were attempted, the defendants who participated therein could have been convicted therefor. But none of them on such evidence could have been convicted of conspiracy to rob the mail on April 6. It was only after the failure of the completed attempt to rob the mail on March 30 that the new scheme, the new conspiracy, was conceived.

We think confusion results from a failure of counsel to distinguish between the facts necessary to constitute a crime and the proven facts on the trial. Because the entire story is related upon the trial, frequently facts not essential to the establishment of the crime charged are received in evidence. To illustrate: In the course of a trial, where the charge is a conspiracy to conceal money stolen from a government post office, the proof may include facts showing actual theft in addition to concealment. The crimes are, nevertheless, distinct, and for the reason that theft would obviously require evidence not necessary to a conviction for concealment.

And greater difficulty in making the distinction clear arises when the crimes charged are different conspiracies. The evidence offered under the various counts may be, and generally is, in many respects alike, but there always appears, where the offenses are different, a fact essential and necessary to a conviction under one indictment that is absent in the other indictment. To illustrate: A., B., C., D., E., and F. may have been in the first conspiracy to rob the mail on March 30; but, it having failed of its accomplishment, F. or E. could have withdrawn, and as to them conviction under count 3 would have been impossible.

The learned trial judge seems to have been very successful in mak-

ing these distinctions clear to the jury, for the jury acquitted all defendants on some counts, and one or more defendants on two of the conspiracy counts. From our examination of the testimony, we are convinced that the jury very understandingly applied the instructions of the court to the evidence, and a discriminating verdict resulted.

[17] It is also claimed that error was committed in permitting the government to show that the defendant Cosmano, when arrested, carried an automatic revolver. The revolver was offered and received in evidence. In arguing this assignment of error, counsel for the defendant overlook the fact that, while the conspiracy to rob may at this time have come to an end, the conspiracy to conceal the stolen property was not at an end. It appeared from other testimony that Murphy, whom the jury may well have found to be the leader in the enterprise, gave a revolver to Teter under circumstances that justified the belief that it was to be used by Teter in furtherance of the conspiracy to conceal the stolen property. Was it not inferable that such was the use to which Cosmano's revolver was being put? Admissions, of course, may be by acts as well as by words. In view of this other evidence, unexplained, might not the jury have legitimately inferred that Cosmano was carrying the revolver as a part of the conspiracy to conceal the stolen property? And if this testimony was somewhat remote, even in the light of other testimony, its pertinency became more apparent in the light of Cosmano's lame and completely refuted explanation of his carrying the revolver. We are likewise not persuaded that this evidence, even though irrelevant upon the issue of concealing stolen property or conspiracy to conceal stolen property, constituted prejudicial error.

Numerous exceptions were taken to the judge's charge to the jury. Many of them related to the offenses charged in the indictment upon which all defendants were acquitted. Others relate to the subject-matters we have already considered. We do not believe they merit separate consideration. No error appears in respect thereto.

The judgment as to Volanti in No. 3067 is reversed, with directions to grant him a new trial.

In No. 3065, against Timothy D. Murphy, and in No. 3066, against Vincenzo Cosmano, and in No. 3068, against Edward C. Gierum, the judgments are affirmed.

## On Rehearing.

Upon petition for rehearing, numerous contentions are made, all of which have been carefully considered. We will discuss only one.

[18] Upon their original argument, the contention was made for defendants Murphy and Cosmano that the crime charged in count 4, indictment in cause No. 1830, was the same as that charged in count 5, of the same indictment, and therefore each defendant had received double punishment. These two counts were both conspiracy counts. Each charged defendant with a conspiracy to violate the provisions of section 197 of the Penal Code (Comp. St. § 10367); in other words, a conspiracy to rob the mails. We pointed out in the original opinion that the conspiracies, though similar, were entirely separate, that one

ended March 30, and a new one was thereafter conceived and carried out April 6.

With this position counsel now acquiesce; but on behalf of defendant Murphy it is urged that a sentence under count 3 of indictment No. 1831 cannot be sustained, in view of the maximum sentences pronounced upon the other two convictions. In other words, defendant Murphy claims he cannot be lawfully convicted and sentenced upon two counts, one charging him and others with a conspiracy to rob the mails, and the other charging him and others with a conspiracy to have in their possession, and to conceal the mail bag and proceeds thereof, secured through robbery, as charged in the previous count.

Some courts have held that, where defendants are charged with robbery and also with having and concealing the property so obtained through the crime of robbery, two separate sentences cannot be sustained. In other words, the crime of robbery, according to these authorities, necessarily involves having the stolen goods in the robber's possession after the robbery has been completed. Tobin v. People, 104 Ill. 565; State v. Honig, 78 Mo. 252; Smith v. State, 59 Ohio St. 350, 52 N. E. 826; In re Franklin, 77 Mich. 615, 43 N. W. 997.

Conviction of the defendant Murphy on the facts in this case can be sustained on no other theory than that the evidence showed the property concealed was the property obtained through the robbery. In somewhat analogous cases, several courts have held that one cannot at the same time commit the two crimes of forgery and uttering a forged instrument, as forgery includes the utterance. State v. Carragin, 210 Mo. 351, 109 S. W. 553, 16 L. R. A. (N. S.) 561; Devere v. State, 5 Ohio Cir. Ct. R. 509; Parker v. People, 97 Ill. 32; U. S. v. Carpenter, 151 Fed. 214, 81 C. C. A. 194, 9 L. R. A. (N. S.) 1043, 10 Ann. Cas. 509; Pitts v. State, 40 Tex. Cr. R. 667, 51 S. W. 906.

In Re Snow, 120 U. S. 274, 7 Sup. Ct. 556, 30 L. Ed. 658, we find another authority which denies to the government the right to split up a single transaction into a plurality of separate indictable and punishable offenses. But two interesting cases are Gavieres v. U. S., 220 U. S. 338, 31 Sup. Ct. 421, 55 L. Ed. 489, and Ebeling v. Morgan, 237 U. S. 631, 35 Sup. Ct. 710, 59 L. Ed. 1151. In the former case (220 U. S. pages 342, 343, 31 Sup. Ct. 422, 55 L. Ed. 489) the court says:

"A conviction or acquittal upon one indictment is no bar to a subsequent conviction and sentence upon another, unless the evidence required to support a conviction upon one of them would have been sufficient to warrant a conviction upon the other. The test is not whether the defendant has already been tried for the same act, but whether he has been put in jeopardy for the same offense. A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other. * * * The offenses charged under this article were not one and the same offense. This is apparent if the test of the identity of offenses that the same evidence is required to sustain them be applied. The first charge alleged 'a conspiracy to defraud,' and the second charge alleged 'causing false and fraudulent claims to be made,' which were separate and distinct offenses, one requiring certain evidence which the other did not. The fact that both charges related to and grew out of one transaction made no difference."

But in the instant case we must pursue the inquiry further. We are not so much interested in the difference, if any, between the commonly called substantive crimes (robbery and having and concealing goods secured through robbery) as we are in the so-called conspiracy offenses. That they are distinct and different offenses must, of course, be conceded. But, upon the facts in this case, is there justification for our reaching a different conclusion, because dealing with alleged conspiracies, instead of the substantive crimes which were the object of the conspiracies? The precise question is: Can a conviction, based upon two conspiracy charges, one charging the defendants with a conspiracy to rob, the other charging them with a conspiracy to have and to conceal the property thus secured through robbery, be maintained? Indeed, the issue may be still further narrowed. *Upon the evidence in this case,* can the conviction on these two counts be sustained? It is true that conspiracies may be established, though the efforts of the conspirators be futile. The fact that the conspiracy fails will not defeat conviction, but as here, when the conspiracy to rob (count No. 5) is followed by success, where the crime which is the object of the conspiracy is committed, it is difficult, to say the least, to determine when the first conspiracy ended and a new conspiracy "to have" the stolen property was conceived.

What is ordinarily contemplated when robbery is committed? Does the robber intend merely to part the robbed of his property? Or does he intend to accomplish two things—the unlawful taking and the unlawful keeping of another's property? And, with more pertinency, may it not be asked whether a criminal conspiracy to rob, conceived and successfully carried out by A., B., and C., may be divided and redivided? Can it be said that A., B., and C., in entering upon the criminal enterprise to rob the United States mail, did not as a part of that conspiracy intend to unlawfully take the mail pouches *and to retain the possession of the property secured through this robbery?*

It may be admitted that separate conspiracies may be thus formed, to effectuate which different plans involving perhaps different conspirators are formulated. We need not decide any such imaginary case, but content ourselves with a decision applicable to the facts in this case. The evidence leaves no room for legitimate discussion. It conclusively establishes but one conspiracy. There was no separate conspiracy to have and to conceal the stolen property, and no evidence tending to show such separate combination.

[19, 20] The Fifth Amendment to the Constitution protects all against double punishment for the same offense. Its enforcement and its application demand a test which is a practical, not a theoretical one. It is the evidence, and not the theory of the pleader, to which we must look to determine this issue. And it is needless to add that one accused of crime, regardless of kind or magnitude of the offense, is entitled to the protection of this section of the Constitution. The sentence on this count therefore cannot be sustained.

The order heretofore entered in said causes in this court is hereby set aside, and the following order is hereby entered:

The judgment as to Volanti is reversed, and as to him the cause is

285 F.—52

remanded. The judgments against the defendants Vincenzo Cosmano and Edward C. Gierum are affirmed. The judgment against the defendant Timothy D. Murphy is modified by striking therefrom that part which sentences him to the penitentiary for a period of two years, and directs him to pay a fine of $10,000 for violation of count 3 of indictment in cause 8330, and in all other respects the judgment against the said defendant Timothy D. Murphy is affirmed.