**BOONE v. NELSON.**
**No. 1754.**

District Court, D. Maine, S. D.
Aug. 12, 1947.

Joseph J. Lyman, of Washington, D. C., for plaintiff.

Edward J. Harrigan, U. S. Dist. Atty., of Portland, Me., for defendant.

CLIFFORD, District Judge.

This is a proceeding under 28 U.S.C.A. §§ 453, 455, to determine whether a writ of habeas corpus should issue. Petitioner prays that the writ issue discharging him from the

808

custody of the Commandant of the United States Naval Disciplinary Barracks at Kittery, Maine, where he is at present committed, following his conviction for voluntary manslaughter by a Navy General Court Martial. Petitioner has exhausted the possibilities of review within the Navy Department, the Secretary of the Navy declining to order a new trial but decreasing petitioner's sentence from five years imprisonment to three years.

Petitioner filed his petition on May 12, 1947. On that day his attorney conferred with the Court, and with the United States Attorney, concerning the filing of briefs and fixing a date for the hearing on the petition. This Court, on July 8, 1947, issued an order to show cause why the writ should not be granted as prayed. Return to this order was made by respondent on July 10, 1947 and amended by leave of Court on July 18, 1947. Counsel for both petitioner and respondent presented briefs and made oral arguments at a hearing on July 18, 1947.

The above procedure was followed because both parties agreed that all the facts to be considered by the Court are contained in the certified copy of the record of proceedings of the Navy General Court Martial in the case of Charles E. Bailey and William J. Boone, Jr., the Petitioner in this proceeding.[1]

■ Were it not for the contentions of petitioner, ably and vigorously argued, that the record is totally devoid of evidence to support a conviction, and that procedural errors by the tribunal amounted to a denial of due process of law, this Court would have deemed it unnecessary to do more than inquire whether it had jurisdiction of the person of the petitioner, and of the subject matter, and whether the sentence imposed was within its lawful powers. But counsel for petitioner, although admitting

that the tribunal was legally constituted and possessed jurisdiction of the person and of the subject matter, argues that the sentence was in excess of jurisdiction for the reason that there was no evidence.[2]

It therefore becomes necessary to examine the record (1) to see if any evidence can be found to support the conviction, and (2) to see if alleged errors of procedure amount to a denial of "fundamental fairness" in the conduct of the trial. United States ex rel. Innes v. Hiatt, 3 Cir., 141 F.2d 664.

■ It appears from the record that the petitioner and his friend, Charles E. Bailey, were Privates in the United States Marine Corps Reserve, stationed at Sasebo, in Kyushu, Japan, and were serving in the occupation forces on the 8th day of March, 1946. On the evening of this day, between 9:00 and 9:30 p. m., they were taking a walk after having attended a battalion beer party and having visited a Red Cross station and a movie theater. As they left this latter place, it was, according to petitioner's estimate, about 9:20 p. m. (R. 92). It was their intention to visit the home of a girl known to one of them. As they approached a bridge, Bailey stopped to tie his shoelace, but Boone, the petitioner, continued on his way and started to cross the bridge. A Korean civilian, Yanagawa, was crossing the bridge, approaching from the other side. He came up to Boone, grasped him by the jacket, asked for cigarettes and was refused. He then pulled Boone about two steps toward the side of the bridge. Boone shouted to Bailey and then struck the Korean in the mouth with sufficient force to knock him to the ground.

The Korean arose and started to run from Boone, in the direction of Bailey who, in response to Boone's shout for help, was running to the scene armed with a four foot stake which he had picked up on his

---

[1] Frequent reference will be made to this record designating such by the letter "R," with appropriate page number.

[2] The rule is here recognized that sufficiency of evidence cannot be reviewed on such a proceeding as this, but petitioner's contention is taken as true that a total absence of evidence would vitiate juris-

diction. Charlton v. Kelly, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274, 46 L.R.A.,N. S., 397; In re Watts, 190 U.S. 1, 23 S. Ct. 718, 47 L.Ed. 933; Ex parte Cuddy, Petitioner, 131 U.S. 280, 286, 9 S.Ct. 703, 33 L.Ed. 154; Clawans v. Rives, 70 App. D.C. 107, 104 F.2d 240, 122 A.L.R. 1436, and In re Schmidt, D.C., 68 F.Supp. 765.

way to assist his friend. The Korean hesitated, turned his head toward Boone, who was about eight feet behind him, and at that moment was struck on the back of the head with the stake, which had been thrown at him by Bailey, who was then about six feet in front of him.

In other words, the Korean was in between Boone and Bailey when hit with the stake, the two Marines being but about 14 feet apart from each other.

The Korean was knocked to the ground, unconscious. Boone and Bailey then dragged or carried him, "out cold" and bleeding, to the side of the bridge. Boone then said to Bailey, "Let's get out of here." He also said that no one would believe their stories. (R. 72, statement on stand; R. 92, written statement.)

At about 9:30 p. m., on their way back to barracks, two members of the military police passed them in a jeep and shortly thereafter stopped them and questioned them about a large stain, later proving to be blood, on Bailey's jacket. Bailey explained, in Boone's presence, that he had cut his hand. But inspection revealed that he had no cuts, and that Boone had only a slight wound that was not then bleeding. They then changed their story and said they had been in a brothel, had thought the MP's were raiding it, and broke a window to get out. One of the girls was cut by the glass and stained the jacket by placing her arm around Bailey when it was ascertained that there was no raid (R. 16). When asked to locate the brothel in question, neither Boone nor Bailey could show where it was, (R. 33).

Boone and Bailey were then allowed to go to their barracks, where they were later questioned. Later in the evening, a search was made for Bailey's jacket. It was found, not among the effects of Bailey, but concealed under Boone's mattress (R. 19).

The Military Police station, at about the time Boone and Bailey were first noticed by the MP jeep on routine patrol, or 9:30 p. m., was informed by a telephone call that a "Jap" had been beaten up by two troops. A second jeep with two men was sent to the bridge mentioned in the report. After driving about the area and seeing no one, the MP's on a closer inspection of the bridge saw a tent peg and a bloodstained cap in the middle of the bridge with stains leading over to the right side. They could see nothing as they looked over the side of the bridge, but, upon descending to the bed of the stream, they found the Korean lying in the water with his feet toward the bridge. (R. 3) A pipe, about two feet in circumference, was running beside and parallel to the bridge, the victim being found beneath the pipe. (R. 7) Stains thought to be bloodstains were detected on the rock wall of the creek. (R. 8)

Nothing else was shown. The Korean died four days later, as a result of the injuries sustained. Both Boone and Bailey were convicted of voluntary manslaughter.

On the above facts, is it possible to say that there was a total lack of evidence implicating Boone?

Upon analysis, petitioner's objection is not directed so much at a lack of evidence as at the interpretation placed on it by the tribunal. In oral argument before this court, counsel for petitioner urged strongly that petitioner's blow with his fist and Bailey's blow with the club were two altercations, whereas counsel for respondent maintained that there was really only one altercation. This is the sequence: Boone, having called for help to his companion, knocked down with one blow the Korean, 50 pounds the lighter of the two; he knew his would-be assailant was trying to flee, saw that the Korean was running directly towards Bailey; he saw Bailey rushing up with a four-foot club (possibly on the assumption that Boone was in danger of his life) until he was about six feet away from the Korean (R. 75); he made no outcry cancelling his call for help, did not try to stop Bailey in any way, did not warn the Korean, although the latter was at that moment looking at Boone and although Boone, himself, had time to step to one side to avoid being hit by the club if it should miss the Korean (R. 75).

These being the indisputable facts, this Court is constrained to say that, without passing on its sufficiency, there was some evidence in the incident, itself, to support the specification against the petitioner. To

characterize the above-described events as "one altercation" was not, in view of the elements of time, of space, and of the relationship of the parties, unreasonable.

But there is more to the case than the events preceding and at the time of the fatal blow. The different stories told by Boone and Bailey as to the end of the bridge to which they dragged or carried the Korean, together with the extreme improbability that the Korean, being admittedly "out cold" (R. 92) on the bridge at some time between 9:20 and 9:30 p. m. when the second MP jeep arrived, could have or would have regained consciousness and climbed down the 10 feet of difficult creek bank (R. 11), could legitimately be the basis for an inference that Boone and Bailey, themselves, threw the Korean into the stream. It is certainly a material consideration.

The fabricated stories of Bailey's cut hand, and of the geisha house raid (originated or adopted by petitioner), the suggestion by petitioner that they leave the scene before they were caught, and the concealment of Bailey's jacket under petitioner's mattress could have been considered by the tribunal as going to petitioner's credibility or scene of guilt.

In a recent case where relator on habeas corpus argued that if he were guilty at all, his guilt was of a lesser offense than that charged, the Court said that evaluation of the evidence with a view to finding guilt of a lesser offense was not authorized. United States ex rel. Okenfus v. Schulz, D.C., 67 F.Supp. 528. The present case is a stronger one in that some at least of the evidence is relevant to the conviction of petitioner as a principal.

Petitioner's contention, therefore, that there was a lack of jurisdiction because of a total lack of evidence is dismissed.

Petitioner further alleges procedural errors amounting to a denial of fundamental fairness. They are: (1) that the duress inducing an initial oral confession attended all subsequent oral and written statements; (2) that he was not given an opportunity to submit his list of witnesses to his commanding officer before trial; (3)

that he was called to the stand before the prosecution had made a prima facie case; and (4) that the Judge Advocate exhibited an attitude of hostility and bias as both prosecutor and witness.

■ This Court must confine itself to answering the question: Were any procedural irregularities substantial enough to amount to a denial of fundamental fairness? United States ex rel. Innes v. Hiatt, 3 Cir., 141 F.2d 664. Petitioner has cited Hicks v. Hiatt, D.C., 64 F.Supp. 238 as illustrating the application of this test. The contrast between that case and this is glaringly apparent. In that case, crucial evidence, though readily available, was erroneously excluded over repeated requests for its introduction, prejudicing the defendant beyond any doubt. In this case, the errors, if indeed there are any, fall far short of prejudicing petitioner.

■ The first alleged error was that duress attended an oral confession made by petitioner to one Sergeant McCann on the night of March 8th, after being apprehended. McCann told Boone that the best course would be for him to tell the truth (R. 35, 36) and neglected to tell him that any statements might be used against him. Nothing else appears in the nature of either a threat or a promise of reward.

Such a set of facts indicates to this Court that the confession was clearly admissible. As Judge Evans said in Murphy v. United States, 7 Cir., 285 F. 801, at page 811: "The expressions, 'better tell the truth,' and 'better be frank,' and 'it will be best for you to tell the truth,' have been before the courts on many occasions, and the majority have held them not sufficient to defeat the admission of the confession. (Cases cited.) But it must be admitted that such language, coupled with other statements, may be so construed as to make resulting admissions incompetent. Such statements might under certain circumstances constitute "a veiled threat,' or 'an inducement,' or a 'promise of later help.' But, standing alone and not otherwise qualified, they are not accepted as disqualifying a confession made pursuant thereto." As for McCann's failure to state that anything said might be used against

petitioner, this is not in itself substantial error. Gerard v. United States, 7 Cir., 61 F.2d 872.

 Notwithstanding this clear law, the court-martial tribunal leaned over backwards and excluded not only the confession to McCann (R. 36) but also one to Warrant Officer Reed after Reed had stated that it could be used for or against him (R. 46). When finally the tribunal allowed the written confession (R. 48), after further ascertaining the conditions under which it was made, petitioner had no legitimate ground for claiming that his rights had not been amply safeguarded. In addition to this, the record indicates (R. 72) that petitioner saw fit to take the stand himself, voluntarily, and repeat in court the identical story which had been the subject of his three prior confessions. Even if there had been any duress in the intial confession to McCann, taking the stand might well be held to have cured the original defects, 41 days having elapsed between the McCann confession and the voluntary testimony in open court. Mangum v. United States, 9 Cir., 289 F. 213, 215.

The second procedural error alleged concerns the lack of opportunity to submit a list of witnesses to the commanding officer. Lacking any showing of prejudice, this must be classed as harmless error. There is no showing whatsoever that petitioner, represented by counsel, did not have full opportunity to call all the witnesses he wished. The record reveals that accused stated that he was ready for trial (R. 20) and later that the defense rested (R. 82); it is inconceivable that these statements could be made if material and available witnesses had not been called. It is a fair inference from the record that the incident happened under such circumstances that there were no favorable witnesses who could have been called by petitioner. The mere fact that, as petitioner points out, the prosecution had 19 witnesses to petitioner's two indicates no unfairness.

The third alleged error is that petitioner was called to the stand during the prosecution's presentation of the case. The record, however, which binds this Court as to facts, shows (R. 45) that petitioner voluntarily took the stand during the prosecution's case to testify to the conditions under which he made his statement to McCann. No authority has been cited for the proposition that this is erroneous procedure. In any event it was not prejudicial.

The last complaint as to procedure concerns the Judge Advocate's taking the stand and showing bias. It was not shown to this Court that allowing a Judge Advocate to take the stand as witness, providing accused has counsel and another officer is sworn in as Judge Advocate, is error. The record reveals no such bias on the part of the Judge Advocate as to convince this Court that it resulted in unfairness to petitioner.

In short, this Court finds that the trial was fairly conducted.

The petition for a writ of Habeas Corpus does not disclose that the petitioner is entitled to his discharge and is therefore denied.